THE COMMERCIAL NATIONAL BANK OF CHARLOTTE, NORTH CAROLINA, EXECUTOR OF THE WILL OF ALBERT B. CLARK, DECEASED, v. THE CHARLOTTE SUPPLY COMPANY, A CORPORATION, EUGENE B. GRAHAM, EUGENE B. GRAHAM, JR., PALMER G. BLACK, T. P. GRAHAM, W. A. GRAHAM AND W. R. ADKINS.

(Filed 5 June, 1946.)

**1. Contracts § 13—**

Where the question of whether a second contract dealing with the same subject matter rescinds or abrogates a prior contract between the parties depends solely upon the legal effect of the latter instrument the question is one of law for the court.

**2. Same—**

A prior contract is not abrogated by a second contract between the parties dealing with the same subject matter unless the second contract is so comprehensive and complete as to raise the legal inference of substitution or unless the second contract presents such inconsistencies that the two cannot in any respect stand together or unless the intent of rescission or substitution clearly appears.

**3. Contracts § 8—**

Where a second contract dealing with the same subject matter does not constitute a rescission of the first the two instruments must be read and construed together in determining the intent of the parties and in ascertaining to what extent the second contract modifies the first.

**4. Contracts § 13—**

In ascertaining whether the parties intend that a second contract abrogate a prior contract dealing with the same subject matter the circumstances surrounding the execution of the contracts, the relationship of the parties and the objectives to be accomplished should be considered when not in conflict with the written instruments.

**5. Contracts §§ 13, 17—**

Testator entered into a contract with a corporation and its other stockholders under which the corporation agreed to purchase the testator's 643 shares, comprising a majority of the stock, at testator's death. Thereafter the corporation obtained a judgment by default against testator and

the parties entered into a subsequent agreement for the cancellation of the judgment upon the conveyance to the corporation by testator of a certain number of the shares. At his death testator owned 500 shares, which comprise less than a majority of the stock. The corporation was a close corporation and its profits were distributed largely by salaries to its officer-stockholders rather than by dividends. *Held:* The acquisition of corporate control was not such a paramount consideration of the parties that its acquisition under the second contract dealt so comprehensively with the subject matter as to raise the legal inference of substitution, since preventing the stock from falling into the hands of strangers was of prime importance to the defendants and the acquisition of a market for the stock was of prime importance to the. testator, and under the circumstances the tender of 500 shares of stock constituted substantial performance.

6. **Corporations § 15—Second contract relating to sale of shares of stock of close corporation held not to rescind prior contract.**

Plaintiff's testator was the majority stockholder in a close corporation. The corporation took out several policies of insurance on his life. Testator executed an agreement with the corporation and other shareholders which provided that upon his death the corporation should purchase the shares at a price to be determined by arbitration, using the insurance money to pay part of the purchase price and the balance from corporate surplus. Thereafter the corporation obtained a judgment by default against testator and in ancillary proceedings had his stock held by a receiver. The parties then made an agreement under which testator conveyed to the corporation a certain number of shares in consideration of the cancellation of the judgment, the lifting of the receivership and the payment to plaintiff of a stipulated salary so long as he should hold 40 per cent of the outstanding stock. Upon testator's death his executor tendered the 500 shares of stock constituting more than 40 per cent of the outstanding stock, which testator had retained, and demanded performance under the original contract. *Held:* The second contract did not abrogate or rescind the first, the two contracts not being inconsistent and the intent to rescind not being apparent.

7. **Contracts § 8—**

The intent of a contract is perforce the mutual intent of the parties, and therefore where the instrument must be construed to ascertain its intent a unilateral purpose will not be given effect in derogation of a mutual intent inferable from the instrument.

8. **Contracts § 18—**

A party who by his own act prevents complete performance of a contract by the other party may not take advantage of his own act and insist upon complete performance when the other party has tendered the substantial performance remaining in his power.

9. **Estoppel § 6a—Corporation held estopped from claiming proceeds of insurance on life of officer-stockholder as a general corporate asset.**

Plaintiff's testator was an officer-stockholder in a close corporation which distributed its profits largely through salaries to officer-stockholders rather than through dividends. Testator entered into an agreement with

14—226

the defendant and other stockholders under which the corporation obligated itself to continue payment of premiums on policies taken out by it on testator's life and to use the proceeds in the purchase of testator's stock upon his death. Upon testator's death the corporation collected the insurance and deposited the proceeds in a separate trust fund. *Held:* During his life plaintiff's remuneration from the corporation was decreased proportionately by the expenditure of corporate funds to pay the insurance premiums, and at his death the corporation and the other stockholders are estopped from claiming the proceeds of the insurance as a general corporate asset.

**10. Contracts § 8—**

In determining the intent of the parties to a contract it will not be assumed that one of them has acted unreasonably or inequitably when a contrary inference is permissible.

**11. Same—**

Acts of the parties indicating the manner in which they themselves construed the contract will be given primary consideration by the courts.

APPEAL by defendants from *Hamilton, Special Judge,* at Extra February Term, 1946, of MECKLENBURG.

The corporate executor of the will of Albert B. Clark brought this action to enforce a contract for the purchase of the stock of its testate in the defendant corporation, made by said corporation and individual stockholders. The Supply Company and the individual defendant stockholders claim that the contract has been abrogated by a subsequent contract dealing with the subject matter, and that they are under no obligation to comply with plaintiff's demands.

The contract was made under the following circumstances and conditions as disclosed by admissions in the pleadings and the evidence taken upon the trial:

The stockholders of the defendant corporation had been few in number and the largest stockholders, other than plaintiff's testate, were family relatives. The practice had been adopted and followed to make nearly all of the stockholders, including Clark, who held a majority of the stock, directors and officers and to distribute the corporate profits by means of salaries to these stockholder-officers rather than by dividends on stock. This practice had obtained since the beginning of business, or certainly for sometime prior to 1928. There was no outside market for the stock, and only those whom the small number of stockholders desired to let in were permitted to buy. The number so admitted through holdings of stock are negligible. The stock at the time of making the first contract of 1928 was held as follows: A. B. Clark, H. W. Eddy, E. B. Graham, P. G. Black and J. H. Denny. Present officers of the company and their

salaries are: E. B. Graham, President, $7,500 a year; Palmer G. Black, Vice-President, $7,500 a year; E. B. Graham, Jr., Secretary-Treasurer, $7,500 a year; W. A. Graham, Assistant Treasurer, $3,000 a year. The same practice existed during the years 1936-1945, with salaries ranging from $2,700 to $8,000. At the hearing of the cause, it appeared that only one dividend—of 5%—had been made in ten years. The company was referred to by the President in his testimony as "our firm" and it was in evidence that its affairs were managed pretty much as a partnership.

For sometime prior to 1939, the defendant corporation had carried a substantial amount of insurance on the life of its President, Albert B. Clark, which, with other insurance, became in part the subject of the agreement set out below.

Under these circumstances the following contract was entered into between plaintiff's testate Clark on the one hand and the corporate defendant and other individual stockholders:

"NORTH CAROLINA

MECKLENBURG COUNTY

"THIS MEMORANDUM OF CONTRACT entered into and made this 18th day of August, 1928, by and between The Charlotte Supply Company, a corporation duly created and organized under the laws of the State of North Carolina, with its principal office in the City of Charlotte in said State, and A. B. Clark, H. W. Eddy, E. B. Graham, P. G. Black and J. H. Denny, owners and holders of the entire capital stock of the said corporation, THE CHARLOTTE SUPPLY COMPANY:

"WITNESSETH: That whereas the said Charlotte Supply Company has procured two policies of life insurance, one for $50,000 and the other for $35,000, aggregating the sum of $85,000 upon the life of the said A. B. Clark, who is president of the said Company, in the Lincoln National Life Insurance Company of Indiana, each of said policies being payable to The Charlotte Supply Company as the beneficiary thereof, the premiums upon the said policies to be paid by the said company:

"AND WHEREAS it has been agreed between the said Company and the said A. B. Clark and the other individual parties above named that upon the death of the said A. B. Clark the proceeds of the said policies shall be collected and placed in the treasury of the Company and shall be used for the uses and purposes hereinafter set forth:

"Now, THEREFORE, in the consideration of the premises and for the further consideration of the sum of one ($1.00) dollar to each of said parties paid by the other and of the mutual promises and agreements

hereinafter set forth, the said corporation and individual parties hereto do hereby covenant and agree to and with each other as follows:

"1. That the said premiums upon the said life insurance policies shall be duly kept up and paid by The Charlotte Supply Company during the effective term of the said policies and each of them; that upon the death of the said A. B. Clark, The Charlotte Supply Company shall collect the proceeds of each of said policies and shall place the same in the treasury of the corporation.

"2. That the said A. B. Clark, being the owner of six hundred and forty-three (643) shares of the capital stock of The Charlotte Supply Company, covenants and agrees that upon his death the executor or administrator of his estate shall sell, assign and transfer to The Charlotte Supply Company the said six hundred and forty-three (643) shares of its capital stock at a price to be fixed by an appraisal thereof carried out and effectuated in accordance with the plan hereinafter set forth, it being understood that in the appraisal of the said stock the proceeds of the said life insurance policies shall be considered as a part of the assets of the said corporation.

"3. That the proceeds of the said life insurance policies shall by appropriate corporate action be paid over to the executor or administrator of the said A. B. Clark's estate in part payment of the purchase price of the said six hundred and forty-three (643) shares of the capital stock of the Charlotte Supply Company and that the balance of the purchase price of the said stock shall be paid by The Charlotte Supply Company out of its surplus, and The Charlotte Supply Company shall have the option of paying the said balance of the purchase price of the said stock in cash or in equal annual installments spread out over a period of ten (10) years or such less time as The Charlotte Supply Company may elect, all deferred payments to bear interest at the rate of six (6) per cent per annum and The Charlotte Supply Company shall have the right to anticipate the payment of any or all installments.

"4. The appraisal of the value of the said stock shall be made within the period of thirty (30) days after the death of the said A. B. Clark by a board consisting of three competent and disinterested appraisers, one of whom shall be selected by the executor or administrator of the said Clark's estate, and another of whom shall be selected by the Board of Directors of The Charlotte Supply Company and these two appraisers so selected shall appoint the third appraiser, and the appraisal or ward of the said three appraisers, or a majority of them, of the value of the said six hundred and forty-three (643) shares of the capital stock of the said company shall be construed as conclusively fixing the value thereof and shall be binding upon all of the parties hereto and the executor or administrator of the estate of the said Clark.

"5. It is the further purpose and plan of the parties hereto that $15,000 additional insurance shall be procured upon the life of the said A. B. Clark, making a total of $100,000 and it is understood and agreed that if and when the policy for the $15,000 additional insurance is procured, the premiums thereon shall be kept up and paid by The Charlotte Supply Company, and the said policy and the proceeds thereof shall be subject to the terms and provisions of this contract.

"IN WITNESS WHEREOF, The Charlotte Supply Company has caused this instrument to be duly executed by its President and attested by its Secretary and its corporate seal to be hereto affixed, and the said individual parties herein named have hereunto set their hands and seal the day and year first above written.

THE CHARLOTTE SUPPLY COMPANY,

Attest:                                     By A. B. CLARK, *President*

H. W. EDDY, Secretary

| A. B. CLARK | (SEAL) |
| H. W. EDDY | (SEAL) |
| E. B. GRAHAM | (SEAL) |
| P. G. BLACK | (SEAL) |
| J. H. DENNY | (SEAL)." |

The defendant corporation complied with this contract, paid premiums and kept up insurance on the life of Clark as agreed, with the exception of one policy of $35,000 which was allowed to lapse, and also took over under the same agreement $8,000 of insurance on Clark's life which he had theretofore carried and paid the premiums thereon. The Supply Co. collected the insurance upon the death of Clark and deposited it in the bank in a special fund, where it still remains. The total of insurance so collected is $73,171.34. Sometime in 1939 the corporation obtained a default judgment against Albert B. Clark in the amount of $12,735.45, and in a proceeding supplemental to execution caused the stock of the said Clark to be put into receivership. Clark had meantime purchased 71 additional shares of stock from Eddy, making his holdings 714 shares.

Several propositions were made to Clark for adjustment of his indebtedness. In order to prevent the stock from being sold under the receivership, and at the insistence of the individual stockholders named, Clark entered into the following contract:

"NORTH CAROLINA

MECKLENBURG COUNTY

"THIS INSTRUMENT, executed this the 29th day of April, 1939, by and between The Charlotte Supply Company, a North Carolina corporation

with its principal office and place of business in the City of Charlotte, Mecklenburg County, North Carolina, party of the first part, Albert B. Clark, of Mecklenburg County, North Carolina, party of the second part, and Eugene B. Graham and Palmer G. Black, of Mecklenburg County, North Carolina, parties of the third part:

"WITNESSETH : That for and in consideration of the mutual promises and covenants hereinafter set forth, the parties above named do hereby agree and contract as follows:

"The Charlotte Supply Company, party of the first part, does hereby promise and agree immediately to cancel the judgment which it now holds of record against Albert B. Clark, the party of the second part, and to submit to a nonsuit and dismissal of that certain action now pending in the Superior Court of Mecklenburg County entitled, 'The Charlotte Supply Company, a corporation, plaintiff, v. Albert B. Clark, defendant,' and to request the discharge of the receiver appointed in said action and to request and to instruct the said receiver to deliver and return to Albert B. Clark, the party of the second part, all shares of stock which have heretofore been taken into possession by the said receiver, and in all respects completely to rescind and terminate the supplemental proceedings instituted in said action and all other measures and proceedings instituted for the purpose of collecting upon the judgment referred to.

"Albert B. Clark, party of the second part, does hereby promise and agree immediately to assign, endorse, transfer, convey and deliver unto the Charlotte Supply Company, party of the first part, the following certificates of stock and all right, title and interest which he, the said Albert B. Clark, party of the second part, has in and with respect to the shares of ownership in The Charlotte Supply Company represented by said certificates of stock:

> Stock Certificate No. 64, issued August 1, 1918, for 107 shares of common stock of The Charlotte Supply Company.
> Stock Certificate No. 68, issued February 7, 1922, for 10 shares of common stock of The Charlotte Supply Company.
> Stock Certificate No. 69, issued February 7, 1922, for 26 shares of common stock of The Charlotte Supply Company.
> Stock Certificate No. 84, issued February 18, 1937, for 71 shares of common stock of The Charlotte Supply Company.

"IT IS STIPULATED AND AGREED by and between all of the parties hereto that henceforth, The Charlotte Supply Company, party of the first part, shall pay to Albert B. Clark, party of the second part, a monthly salary which shall be equivalent to the monthly salary paid by The Charlotte Supply Company to Eugene B. Graham or to Palmer G. Black, whichever shall be the greater.

"It is stipulated and agreed that such salary shall be paid to Albert B. Clark only so long as he shall continue to own at least forty (40%) per cent of the outstanding common stock of The Charlotte Supply Company; and it is stipulated and agreed that except with the consent of Albert B. Clark, no further or additional shares of common stock shall be issued by The Charlotte Supply Company.

"IT IS STIPULATED AND AGREED that after the transfer by Albert B. Clark to The Charlotte Supply Company of the certificates of stock hereinabove designated, Eugene B. Graham and Palmer G. Black or either of them shall have the right and privilege to purchase the shares of stock represented by said certificates or any part thereof at a price of $61.60 per share and shall have the right to pay for the same by the cancellation of indebtedness which the books and records of The Charlotte Supply Company show to be due at the present time by The Charlotte Supply Company to Eugene B. Graham and Palmer G. Black. To the extent that such indebtedness shall not be sufficient to pay for as many of said shares of stock as Eugene B. Graham and Palmer G. Black or either of them may desire to purchase at the rate of $61.60 per share, then and beyond that point, Eugene B. Graham and Palmer G. Black, or either of them, shall pay for said shares of stock in cash at the rate of $61.60 per share.

"IT IS STIPULATED AND AGREED that at any time within twelve months from this date, upon demand by Albert B. Clark, The Charlotte Supply Company or Eugene B. Graham and Palmer G. Black shall sell, transfer and deliver to Albert B. Clark 100 shares of the common stock of The Charlotte Supply Company upon payment in cash by Albert B. Clark therefor at the rate of $61.60 per share.

"IT IS STIPULATED AND AGREED that Albert B. Clark shall pay all court costs which have accrued in the legal action and proceedings referred to above and shall further pay the fee or charge of the receiver referred to above.

"IN WITNESS WHEREOF, the parties above named have hereunto set their hands and seals, this the day and year first above written.

THE CHARLOTTE SUPPLY COMPANY

By:  (s)  PALMER G. BLACK
            Party of the first Part.
            (Corporate Seal)
         ALBERT B. CLARK
            Party of the Second Part.
    (s)  EUGENE B. GRAHAM   (SEAL)
    (s)  PALMER G. BLACK    (SEAL)
            Parties of the Third Part.

"NORTH CAROLINA

MECKLENBURG COUNTY

"We, the undersigned, owners and holders of stock in The Charlotte Supply Company, do hereby join in the foregoing contract and agreement for the purpose of binding ourselves by the terms thereof; and we do hereby consent and agree that the terms of the foregoing contract are acceptable to us and we do hereby agree that the provisions of said contract shall be fully carried out as set forth therein. And we do hereby waive any and all rights we may have as stockholders of The Charlotte Supply Company or otherwise which may be inconsistent with the terms of the foregoing contract or which may in anywise interfere with the full execution thereof.

"Witness our hands and seals, this the 29th day of April, 1939.

(s)   EUGENE B. GRAHAM, JR.   (SEAL)

(s)   THOS. R. PEGRAM   (SEAL)

Witness:

(s)   ALICE C. MOORE."

The Supply Company carried out this contract with Clark as respects his salary, which ceased at his death.

Of the 214 shares transferred by Clark to the corporation, 107 shares were taken by Black and E. B. Graham at $61.60 per share; and 7 additional shares were sold to T. R. Pegram at the same price, leaving 100 shares still in the treasury of the corporation. Later, in July and August, 1945, 45 shares each were issued to E. B. Graham and Palmer G. Black, which transactions plaintiff claims were without authority, and contrary to corporate law.

By this transaction the stock of A. B. Clark was reduced to 500 shares.

Upon several demands of the plaintiff executor that defendants carry out the 1928 contract by purchasing the remaining Clark stock and applying thereon the $73,171.34 in accordance with said agreement, the defendants declined to take any action, contending that the 1939 agreement in legal effect abrogated the 1928 agreement, and that Clark by the transfer of 214 shares to the corporation, with options permitting its acquisition by certain of the defendants, had made it impossible for Clark to perform his part of the contract by delivering the 643 shares named therein. The plaintiff contended that the effect of the 1939 contract was merely to modify the 1928 contract, leaving its more important considerations and engagements unimpaired, and that in equity these remaining provisions, as they apply to the stock of Clark, should be carried out; otherwise, it was contended, the stock will be made worthless because of the circumstances, and this was well understood by the parties

to the contract at the time it was made, and that these conditions still exist. Amongst these circumstances, plaintiff stressed the fact that the Supply Co. is a close corporation, that there is no outside market for the stock; that the practice of distributing the profits through salaries to the office-holding stockholders, without declaring dividends, will destroy the utility and the value of plaintiff's stock and make it to all intents and purposes worthless, while at the same time having a nominal book value; and that it would be contrary to the intent of these contracts—construed together, and inequitable; that equity demands the enforcement of the original contract with respect to the purchase of the stock, and the application thereto of the insurance money as a trust fund; and that under the circumstances adequate compensation as damages for breach of contract cannot be afforded plaintiff.

Upon the hearing the appraisal of the 500 shares of the Clark stock as of the end of thirty days after his death was determined by the trial judge, in accordance with stipulations of the parties, without the intervention of the jury, and the value found to be $102,500.

The case was submitted to the jury on issues mainly involving propositions of law, and, on instruction by the court, the issues were answered favorably to plaintiff.

Judgment was awarded declaring the insurance collected on the life of Clark a trust fund, and directing its application upon the purchase price of the 500 shares of stock at the court appraised value, and that it be kept pending the final termination of the litigation and used in no other way; that the balance of the purchase price be paid out of other corporate funds; that immediate payment of the said purchase price and interest thereon be made by the defendant Charlotte Supply Co. and its officers in its behalf upon presentation of the stock certificates appropriately endorsed. Defendants appealed.

*Robinson & Jones for plaintiff, appellee.*
*Guthrie, Pierce & Blakeney for defendants, appellants.*

SEAWELL, J. We have two transactions to consider on appeal—the 1928 contract respecting the sale of Clark's stock to the defendant corporation, still not fully performed, and the 1939 contract under which the corporation acquired a portion of the stock theretofore promised it. The appeal raises the question whether the 1928 contract was abrogated or merely modified by the subsequent agreement and incidental transfer of stock, and if modified, to what extent; and specifically whether the provisions of the 1928 contract respecting the purchase of the Clark stock and application thereto of the insurance on Clark's life still subsist and are applicable to the 500 shares of stock now in the hands of the plaintiff.

In the court below this question was determined on pertinent issues by the jury, but on instruction by the court to which defendants excepted. The exception, however, does not seem to be directed to the form of the instruction, but to the supposed error in law in implying that the plaintiff was entitled to recover at all upon the facts. In fact, the appellants do not raise the question whether it was the intention of the parties to rescind the existing contract and substitute a new agreement for it—except as might be deduced from the legal effect of the later instrument, which is not a jury question.

The second instrument, touching only in part the subject matter of the first, does not contain any express agreement from which the purpose of the parties can be ascertained. In its face, the 1928 contract is not mentioned at all. We are left to determine the effect of the later contract upon the former from the implications contained in the instruments and relevant circumstances competent to aid in interpretation. *Redding v. Vogt,* 140 N. C., 562, 564, 567, 53 S. E., 337; 12 Am. Jur., p. 1013, sec. 433; 17 C. J. S., p. 885, ss. 394, 395.

The making of a second contract dealing with the subject matter of an earlier one does not necessarily abrogate the former contract. To have the effect of rescission, it must either deal with the subject matter of the former contract so comprehensively as to be complete within itself and to raise the legal inference of substitution (*Redding v. Vogt, supra,* and citations), or it must present such inconsistencies with the first contract that the two cannot in any substantial respect stand together. *Redding v. Vogt, supra; Myers v. Carnahan,* 61 W. Va., 414, 57 S. E., 134; Am. Law Inst., Rest., Contracts, Vol. 2, p. 408; 2 Black on Rescission and Cancellation, p. 530. Where, upon inspection of the instruments and consideration of the circumstances under which they were executed, it appears that rescission has not taken place, those provisions of the former instrument which are not substantially involved in the contradictions and thereby revoked still subsist and may be enforced. Rest., Contracts, *supra,* Vol. 2, sec. 408; 17 C. J. S., p. 886, sec. 395, *supra;* 13 C. J., pp. 603 and 604, sec. 628. Before the new contract can be accepted as discharging the old, the fact that such was the intention of the parties must clearly appear. *Menefee v. Rankins,* 158 Ky., 78, 82, 164 S. W., 365. If upon comparison it should be found that rescission has not been effected, the two instruments must be read and construed together in ascertaining the intent of the parties and in determining what portions of the agreement are still enforceable. In such construction the rules applied to interpretation of a single contract are applicable, perhaps with added propriety. We must, of course, keep within the bounds of the writings, but the circumstances surrounding their execution, the relation of the parties and the object to be accom-

plished, are all to be consulted in arriving at the intent. *Lumberton v. Hood,* 204 N. C., 171, 167 S. E., 641; *McMahan v. R. R.,* 170 N. C., 456, 87 S. E., 237.

The appellants present their argument for rescission in somewhat inconsistent formulas: First, that Clark, having disposed of a substantial part of his stock in a later transaction, made it impossible for his executor to deliver the quantity of stock contracted for; and second, that Clark having complied with the main purpose of the contract sought to be enforced under a new and different agreement, and for a new consideration, the latter is necessarily substituted for the former and works its abrogation.

In the first place, the appellants rely on the broad proposition of law that Clark by the voluntary transfer of 214 shares of stock to defendants (including 71 shares acquired subsequently to the original agreement), thereby reducing his total stock to 500 shares, had rendered it impossible for his executor to deliver the 643 shares promised, and that the substantial difference between the number of shares promised and the number of shares tendered amounts in law to a complete failure in performance, discharging the defendants from the obligation to purchase. *Edgerton v. Taylor,* 184 N. C., 571, 115 S. E., 156; *Wade v. Lutterloh,* 196 N. C., 116, 144 S. E., 694; *Seed Co. v. Jennette Bros. Co.,* 195 N. C., 173, 141 S. E., 542; *West v. Ins. Co.,* 210 N. C., 234, 186 S. E., 263; *Supply Co. v. Roofing Co.,* 160 N. C., 443, 76 S. E., 498; *Ducker v. Cochrane,* 92 N. C., 597. That might be consistently argued and maintained under the cited authorities if the transaction had been between outsiders and at arms length, and if it had been simply one of purchase of stock on the open market as an investment, and if the transfer involved no more than payment of the purchase price. But these negative conditions are not present and the existing positive conditions are all *contra.* Both transactions were with the defendant corporation, in which Clark was a stockholder. The later agreement resulted in the immediate transfer to it of a portion of the stock originally promised, albeit defendants' contend upon a new consideration. The circumstances under which the contracts were made enter into their interpretation, strongly repelling the application and conclusiveness of the principle appellants regard as decisive.

An inspection of the 1928 contract, now under immediate discussion, and the facts of record bearing on it, convince us that the *identity* of the stock held by Clark more importantly engaged the attention of the contracting parties than its *quantity* in working out the mutual protection which was the gist of the agreement, and that it is at present more deeply involved in the equities of decision. The contract contemplates the purchase of all of Clark's stock en bloc, referring to it by specific description. It was referred to specifically and given a character by a formal listing

of each share as constituting the stock held by Clark; but, which is of more importance, the stock had a relation to the end to be accomplished which necessitated its treatment as an entirety. The purpose, in the light of the admitted facts, was to prevent Clark's stock from going into outside hands at his death and to provide a market for it in that event which his widow could not otherwise enjoy. The *purchase* of the stock, its *acquisition* by the corporation was the *desideratum,* and not its investment value. This more clearly appears when we note that no purchase price was named, but only a method provided for ascertaining its value after Clark's death, which was to be its purchase price. The whole contract faces toward Clark's death and the consequences that might follow upon that event—the effect on a business in which almost all the stockholders in the corporation were officers receiving salaries with little or no regard for the character or extent of the service performed. It was primarily intended to protect the *status quo* from outside interference. On the one part it was necessary to see that the stock did not fall into the hands of strangers through sale at the death of Clark, and on the other it was necessary to see that the stock left to Clark's widow should not, in the process of affording protection to his associates, be left without a market, and while having a value on the books, become worthless to his widow as an income producing investment. The alternative for Clark was obvious; sale of his entire stock in the only market available, that is, within the confines of the corporation. With these considerations before us, it is clear that the sale of the 214 shares of stock under the 1939 agreement to the corporation to which it had been previously contracted cannot be regarded as an independent, unrelated transaction, *ipso facto* releasing defendants from the obligation of purchasing the remaining stock.

In this outline may also be found the answer to the view urged by counsel that *corporate control* was the thing bargained for in the 1928 contract, and that this, having been surrendered by Clark and acquired by defendants upon a new consideration in 1939, no further performance on their part is required. The position is expressed in the brief:

"Upon the slightest consideration of this case, it is apparent that the purpose of the individual defendants in entering into the 1928 contract was that upon Clark's death, they would be assured of becoming the majority stockholders of the defendant Company instead of Clark's controlling interest in the Company passing into alien hands—with all the hazards which that would imply for the jobs and fortunes of these defendants. The essential thing of value in the 1928 contract for them was the securing of hold on a sufficient number of shares to constitute, with that they already held, control of the defendant Company. . . . This brings us to the crux of the case: In 1939, Clark, for a new and

separate consideration and value, conveyed to the defendants that which had been for them the essential thing of value in the 1928 contract, namely, a quantity of stock representing controlling interest in the Company. Thus Clark in effect, in 1939, lifted the heart out of the 1928 contract and for a newly given value, conveyed it to the defendants. Thereby, he incapacitated his executor from now delivering to the defendants the very essence and substance of what the 1928 contract stipulated his executor would deliver."

It may be that some of the individual stockholders signing the 1928 contract with the corporation had the ultimate purpose of exercising corporate control by combining their holdings after the purchase of the Clark stock had been consummated. But this was not within the terms of the instrument; it could follow only from understanding or action *dehors* the contract and with which it has nothing to do. The corporation agreed to purchase the stock and all of the stockholders signed in token of assent. Corporate control was not in terms or in legal effect bargained to any stockholder or group of stockholders. A contract to convey to the corporation its own stock, although a majority in amount, does not have that effect and cannot be so construed.

In fact, the shifting of corporate control to any individual or group within the circle of stockholders does not appear to have been a matter of importance to any of the contracting parties at the time. The most favorable inference with respect to the significance of corporate control to be drawn from the circumstances under which the contract was made and the conditions sought to be met falls short of appellants' postulated defense. The inference is that it would be an additional, but by no means the whole, embarrassment if Clark's stock went into outside hands at his death. The holding of that amount of stock, or any considerable amount, by strangers who might be dissatisfied with the manner of conducting the corporation, and the probability of resort to legal redress, was serious enough to induce the contract and of sufficient substance to repel the suggested defense that the purpose of the original contract had been accomplished under a new agreement. On the other hand, the fact that Clark's stock carried with it corporate control was necessary to its protection in case of his death and was the only thing that would open a way for an outside market in that event. The advantage was mutual, and the mutual protection was the basis of the agreement. There is not sufficient reason in the bare facts of the 1939 contract to infer that the parties had in mind to abrogate it. We can see no satisfactory principle upon which the 1928 contract can be brought into comparison with the subsequent transaction other than that which we have already stated; that its primary and controlling purpose was to keep the stock out of the

hands of strangers and afford Clark a market for his stock, which his widow might not have been able otherwise to obtain.

The intent of a contract, unlike that of a will, is necessarily composite, often concessive, essentially dual. There can be no unilateral purpose in a bilateral contract. When the purpose is once brought into the contractual relation, it becomes relative, falls into the legal perspective. Therefore, we cannot, without destroying the intent of the instrument, segregate and paramount an incidental advantage moving to either party in derogation of the correlative rights of the other.

The supposed inconsistencies raised between the two instruments by the 1939 contract are unsubstantial. It is argued that the new considerations given for the purchase of the 214 shares of stock are inconsistent with the provisions of the prior agreement, and have the effect of abrogation. The variant considerations are pointed out as: (a) The discharge of the judgment amounting to $12,735.45 held by the corporation against Clark in payment for the 214 shares transferred to the company; (b) the agreement to pay to Clark a substantial salary so long as he held 40% of the stock in the company; (c) lifting the receivership from his property.

On scrutiny it will be found that the monetary consideration was not substantially different in source and character from that which he had been promised in the 1928 contract and that which he had theretofore enjoyed as a holder of stock, and to which he was entitled by reason of their method of distributing profits; and that the termination of the receivership was a mere incident of payment of the judgment. To regard it as more would not be advantageous to appellants on equitable grounds. It would merely add to the impression that the action taken by the corporation and its stockholders was in the nature of a designed prevention of performance.

As to the price paid for the stock, it came from the surplus assets of the corporation, just as was originally intended. The 1928 contract contemplated that the insurance fund would not be sufficient to pay for the stock, and that it should be supplemented by the surplus funds of the corporation. There is this difference, however, which moved to the advantage of the defendants: Under the 1939 agreement the price fixed upon the stock was approximately $61.60 per share, while the ascertained value for the 500 shares of stock as of Clark's death was $102,500, resulting in a large saving to the purchasers at that time.

The salary promised Clark was merely a continuance of the method of distributing the profits of the corporation through salaries and was proportionately no greater than that paid other officer-stockholders whose services were neither obligatory nor significant, and the salary was comparable to that he had previously enjoyed. Appellants have claimed for this provision the significance it would have had if paid to a stranger

for an entirely new performance; it cannot be given that effect. The mere continuation of a former practice cannot have that effect.

In other respects, the provisions with respect to Clark's salary are significant. There was no agreement that it should be paid up to the time of his death, but only so long as he held 40% of the stock, that being the amount he then held. Its effect, therefore, was to freeze the stock in his possession so that he could not sell any of the stock on the outside market, even had there been one; and this tended to strengthen rather than defeat the objects of the original contract.

On the whole, the later transaction may be consistently regarded as a partial performance of the original contract on both sides, intended to establish a *modus vivendi* under the new conditions presented until the corporation should have the funds with which to complete the purchase— thus anticipating *pro tanto* the final delivery.

Although, as we have seen, the 1939 contract can be reconciled with the substantial provisions of the 1928 contract without abrogation of that instrument, another circumstance connected with the execution of the later instrument must receive consideration.

The record shows that the 1939 contract, under which Clark transferred to the Corporation part of the stock he had contracted to deliver, was induced and brought about by the act of the defendants themselves or those who were then concerned in the purchase of the stock, and that they admittedly received the benefit of the stock transferred. While there is some difference in the factual situations in cited cases and in the phraseology employed in the opinions on the subject, the controlling principle in all of them is clear: Where complete performance is rendered impossible by a party to a contract who has the duty of counter performance, the latter cannot take advantage of his own act and refuse performance on his part. *Whitlock v. Lumber Co.,* 145 N. C., 120, 58 S. E., 909; *Harris v. Wright,* 118 N. C., 422, 24 S. E., 751; *Navigation Co. v. Wilcox,* 52 N. C., 481; *Harwood v. Shoe,* 141 N. C., 161, 53 S. E., 616; 12 Am. Jur., p. 885; 12 Am. Jur., p. 958, Text and Notes, 1415; Rest., Contracts, sec. 295; *Morrison v. Walker,* 179 N. C., 587, 103 S. E., 139; Willison on Contracts, sec. 668.

In delivering the opinion of the Court in *Navigation Co. v. Wilcox, supra,* and citing *Lord Coke's* illustration of the rule, *Chief Justice Pearson* stated the principle in this language: "One who prevents the performance of a condition or makes it impossible by his own act shall not take advantage of the nonperformance."

*Justice Brown,* speaking for the Court in *Harwood v. Shoe, supra,* says: "This rule applies with especial fitness where the party is impelled by personal interest."

But apart from this consideration, there is little or nothing in the 1939 contract that would lead to the conclusion that the parties to the new contract intended otherwise than to create an *ad interim* arrangement adjusted to the new conditions until final compliance with the terms of the original contract became possible. Under the 1928 contract, and corporate approval thereof, the insurance upon Clark's life was set apart as a trust fund, to be applied to the purchase of his stock after his death. He contributed to that fund more than one-half for the eleven years preceding that contract, and the very substantial sum of 40% from the making of that contract to his death. Looking at the situation as it affected his widow, the corporate assets which would otherwise have been hers were constantly depleted in the creation of this fund down to the time of her husband's death. Meantime, the character of that trust fund remained the same, without any attempted corporate action to change it, and with no notice whatever to Clark of any intention to do so. The defendants are now estopped from claiming it as a part of the general corporate assets, freed from any commitment to the purpose of its creation.

As we have seen, it is incumbent upon the proponents of rescission to make it clear that the second instrument was so intended or has that effect. In passing upon that question, we are not required to assume that men have acted unreasonably or inequitably, when the contrary inference is apparent.

The purchase of Clark's stock under the 1928 contract was by far the most important and outstanding engagement of the company, inevitably inviting attention of those making the new contract if the purpose was thereby to terminate it. It is hardly likely that business men, if they had intended that the 1939 instrument should discharge the obligation of such an important nature, would have failed to give some expression of this intention in the instrument which appellants now contend has that effect. The inference is that they did not so intend.

The conduct of the parties in dealing with the contract indicating the manner in which they themselves construe it is important, sometimes said to be controlling in its construction by the court. *Smith v. Paper Co., ante,* 47; *Hood v. Davidson,* 207 N. C., 329, 177 S. E., 5; *Wearn v. R. R.,* 191 N. C., 575, 132 S. E., 576; *Old Colony Trust Co. v. Omaha,* 230 U. S., 100, 57 L. Ed., 1410. For eleven years prior to 1939, Clark held all of the stock in readiness to comply with his part of the bargain, and the defendants carried out theirs, paying the premiums on the insurance in contemplation of the purchase of the stock. After the 1939 contract they continued to pay the insurance with no indication, as we have noted, that it was not regarded as a trust fund for the purchase of the stock and with no corporate action attempting to change its charac-

ter, and when the insurance was collected it was deposited in a special fund. The facts of the case strongly indicate that the obligation to purchase the stock was regarded as still outstanding.

We conclude that rescission of the 1928 contract was not in contemplation of the parties in the making of the 1939 agreement, and that no abrogation or rescission has been made of its substantially mutual obligations with respect to the purchase and sale of the stock. The obligation created by the earlier contract still applies to the 500 shares of stock now in the hands of the plaintiff executor, to be performed in accordance with the provisions of the contract.

The question presented to us upon appeal has been that of rescission or modification; the defendants raised no question as to the nature of the remedy sought. The very able argument of the contentions on both sides must account for the length of this discussion.

It is our conclusion that the result reached in the trial is in accord with the applicable principles of law and is justified by the facts of record.

· We find

No error.