611 P.2d 1011

**SILVER SYNDICATE, INC., an Idaho Corporation, Plaintiff-Respondent,**

v.

**SUNSHINE MINING COMPANY, a Washington Corporation, Hecla Mining Company, a Washington Corporation (successor to or assignee of Polaris Mining Company, a Delaware Corporation), Silver Dollar Mining Company, an Idaho Corporation, Defendants-Appellants.**

Nos. 12277, 12306.

Supreme Court of Idaho.

Oct. 2, 1979.

John S. Simko, of Elam, Burke, Jeppesen, Evans & Boyd, Boise, and Piatt Hull, of Hull & Hull, Wallace, for defendant-appellant Sunshine Min. Co.

James P. Keane, of Brown, Peacock, Keane & Boyd, Kellogg, for defendants-appellants Hecla Min. Co. and Silver Dollar Min. Co.

Robert W. Mullen, Wallace, for defendant-appellant Hecla Min. Co.

Robert L. Magnuson, of Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for defendant-appellant Silver Dollar Min. Co.

Donald R. Kunz, of Kunz & Waigh Ltd., Phoenix, Ariz., and E. L. Miller, of Miller & Knudson, Coeur d'Alene, for plaintiff-respondent Silver Syndicate, Inc.

SHEPARD, Justice.

This is an appeal from a judgment in favor of plaintiff-respondent Silver Syndicate in an action by it seeking a declaratory judgment as to the interpretation of certain contracts entered into in the 1940's, and further for a decree quieting title to certain underground ores and/or the profits resulting from the mining of said ores. We affirm.

Sunshine Mining Company owns a group of mining claims located in the westerly end of what is known as the Silver Belt in Shoshone County, Idaho. Sunshine is one of the largest producers of silver and antimony in the United States and operates an extensively developed mining system. The shafts of such mines may extend 6,000 feet below the surface of the earth and contain in excess of a hundred miles of underground tunnels.

Silver Syndicate owns mining claims lying to the north of Sunshine's claims. East of the Silver Syndicate claims lie the Eleventh Hour Group mining claims owned jointly by Sunshine and Hecla Mining Company. Southeast of the Eleventh Hour and Syndicate claims lie the "Polaris" claims owned by Hecla as the successor of Polaris Mining Company.

Two major fault structures course through the foregoing general area, one of which is presently known as the "Silver Syndicate Fault." It trends in a general northwesterly direction and dips to the south. The precise surface location of that fault over most of its strike length had not been determined as of the time of trial, but underground that fault crosses the Syndicate claims, a small portion of the Eleventh Hour claims, and the Polaris claims. As the Silver Syndicate Fault dips downward, it curves southerly.

Prior to 1938, Sunshine had become a large silver producing property with extensive and deep workings. In 1938, Sunshine and Silver Syndicate entered into two agreements which provided that Sunshine would drive a crosscut from Sunshine's shaft 1700 feet below the surface in a northerly direction toward the property of Silver Syndicate. Although the parties hoped thereby to encounter commercial ores, they met with negative results. At about that same time, Polaris and Sunshine negotiated for the development of the east end of the Sunshine-Polaris Vein System, which was situated to the south of the Silver Syndicate Fault. An agreement was reached between Sunshine and Polaris establishing a so-called "Intervening Area" in which certain rights were allocated to Sunshine and certain to Polaris. Sunshine drove a crosscut from its shaft beginning at a level of 1900 feet below the surface. That crosscut intercepted an extension of the Silver Syndicate Fault lying in the Sunshine ground, but also with negative results.

In 1943, Polaris requested Sunshine to drive a crosscut northerly from the 2700 foot level of the Sunshine Mine shaft, hoping to intercept an extension of the Chester Vein. The Chester Vein connects the Silver

Syndicate Fault and the Polaris Fault. While driving that crosscut, Sunshine intercepted a high grade ore body within the Chester Vein lying within Sunshine's claims. When that ore body was discovered almost a half mile below the surface, it became apparent to all parties that "extralateral rights" problems could develop in the event the apex of those veins or ore bodies lay outside the northerly boundary of Sunshine's property.

"Extralateral rights" were created and are governed by the Congressional Act of May 10, 1872, now codified as 30 U.S.C. § 26 (1971), which provides:

"The locators of all mining locations made on any mineral vein, lode, or ledge . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges."

The law grants the locator of a mining claim ownership rights which extend beyond the defined boundaries of his claim and thus it is clear that the said act of May 10, 1872 effects traditional notions of ownership of real property.

"The apex clause in the Act modifies the common law by enlargement to the extent that the claimant owns and may follow any lode whose apex he covers, beyond his sidelines under land adjoining. On the other hand, he is not the owner of lodes found within his lines extended downward vertically where such lodes have their apices outside of his surveyed lines." Morrison's Mining Rights 199 (16th ed.1936).

"Property rights conferred by lode locations may be subdivided for the purpose of convenience into two classes:—

(1) Those which are confined to things embraced within the boundaries of the location. By the term 'boundaries,' as we here employ it, we include not only the surface lines, but the vertical planes drawn downward through them. If we may be excused for introducing into the mining vocabulary coined and eccentric words, we would classify these rights as *intralimital* ;

(2) Those which, while depending for their existence upon the ownership of things within the boundaries, may be exercised under certain conditions and restrictions out of, and beyond, those boundaries. These rights may be classified as *extralimital*." 2 Lindley on Mines § 549 (3d ed.1914) (emphasis original) Most authorities denominate these rights as extralateral.

It is also clear that extralateral rights only exist within the intralimital area of rights of an adjoining property owner.

"The grant of the right of lateral pursuit is, in legal effect, a severance of the estate in the vein from the ownership of the soil into which it penetrates after passing on its downward course beyond the vertical planes drawn through the surface boundaries of the location or patent." 2 Lindley on Mines § 568 (3d ed. 1914).

*See also Silver Surprize, Inc. v. Sunshine Mining Co.*, 15 Wash.App. 1, 547 P.2d 1240 (1976), for a scholarly and thorough analysis of the apex law in a case much similar to the one at bar.

On June 24, 1943, shortly after the ore body discovery on the 2700 foot level crosscut ("2710 crosscut") Syndicate and Sunshine entered into a lease agreement, which recited that it was "possible that veins, lodes and ledges apexing in the Lessor's [Silver Syndicate's] ground may pass into the Lessee's [Sunshine's] ground on their

downward course, and which veins, lodes or ledges the Lessor [Silver Syndicate] may have the right to pursue on their downward course." Therein was established a vertical plane which was dropped through the westerly end lines of Sunshine's Majestic and Rambo mining claims. Sunshine was granted the right to mine east of that vertical plane any and all veins, lodes, ledges or bodies that Syndicate might own by virtue of extralateral rights. Sunshine agreed to prospect and develop the so-called "Chester-Silver Syndicate Vein" east of that vertical plane. Silver Syndicate, as lessor, was to receive 40% of the net proceeds of the mining operations, and Sunshine was to retain the balance. It was agreed that if any reasonable doubt should exist as to the legal ownership of any of the mined ore or mineral values, Sunshine could, nevertheless, mine the ores and place 40% of the proceeds in a trust fund account until such time as the ownership was definitely determined.

That lease of 1943 did not, of course, settle the questions of ownership surrounding the vein under the aforementioned apex law. The parties to that lease recognized that the determination of the exact location of the apex of that vein and the proof of continuity of the vein to the surface would require a substantial amount of time, money and litigation. Silver Syndicate, Sunshine and Polaris believed common sense dictated the reaching of a compromise.

It appears that such a compromise was affected on August 4, 1943, when the parties entered into what will hereafter be referred to as the "1943 Contract." That contract noted that Sunshine had encountered a vein and fault zone within its workings which was identified as the "Chester Vein." In the recitals of that contract, it was stated that only Sunshine, with its extensive mining facilities, could explore and mine the Chester Vein. It was further recited that the Chester Vein could be mined under "working agreements with Syndicate and with Polaris if the parties can reach agreement as to a division of their rights without resorting to litigation." It was then stated that the contract was entered into "for the purpose of settling the

rights of the parties hereto in the Chester Vein for the mutual benefit of the parties hereto."

The first operative paragraph of that agreement established a vertical dividing plane running approximately in a north-south direction. Silver Syndicate conveyed to Sunshine and Polaris any extralateral rights Silver Syndicate might own in the Chester Vein lying east of that dividing plane. Polaris conveyed to Silver Syndicate any extralateral rights in the Chester Vein lying west of the dividing plane that Polaris might own by virtue of its ownership of the Polaris claims and its part ownership of the Eleventh Hour Group. Polaris further conveyed to Silver Syndicate any interest it owned in the "Intervening Area" resulting from its earlier contract with Sunshine and any interest Polaris might own between the Intervening Area and the dividing plane. Sunshine conveyed to Silver Syndicate all of its extralateral rights in the Chester Vein west of the dividing plane which were termed "flowing from" its co-ownership with Polaris of the Eleventh Hour Group.

In the eighth operative paragraph of that 1943 Contract is contained an important definition:

"Chester Vein, as above identified, shall be considered to mean the extension of this vein on its strike and dip and all parallel and branching or intersecting veins or other veins and ore bodies for 200 feet to the north and 200 feet to the south of the center of said Chester Vein. Displacement by faulting of the Chester Vein zone or local pinching or absence of ore in the Chester Vein zone, shall not be deemed a termination of its extension on its strike or dip."

The only other part of the contract particularly pertinent is paragraph twelve, which provides that the agreement "shall constitute a covenant running with all claims, whether patented or unpatented, now or hereafter owned or controlled by the parties hereto, and this agreement shall be binding upon the parties hereto and their successors and assigns."

Following its execution, the contract was ratified by the stockholders of the respective corporations. Sunshine immediately initiated a concerted effort to mine and explore the "Chester Vein." The Lease of 1943 was treated as one of the "working agreements" noted in the 1943 contract, and Sunshine paid over to Silver Syndicate 40% of the net profits from those mining operations. The trust provision for proceeds from ores of doubtful ownership was never utilized. The area subject to the 1943 Lease became known informally as the "Rambo Area," representing some 1100 feet in length extending westerly from the dividing plane to the westerly edge of Sunshine's Rambo and Majestic claims.

During July 1944, Silver Syndicate advised Sunshine that it was dissatisfied with the operations under the 1943 Lease because Sunshine was getting a majority share of the profits. Sunshine and Syndicate thereafter entered into negotiations which resulted in a contract dated August 1, 1944. The interpretation of that agreement, together with the 1943 contract, is essentially the basis of this litigation.

The recital provisions of the 1944 Contract are much like those of the 1943 Contract. The provisions note Sunshine's extensive workings and its ability to exploit Syndicate's property more economically than could Syndicate. The difficulty of establishing extralateral rights under the apex law is also mentioned. It is then stated that:

"Sunshine in the course of its development programs has encountered a mineral bearing vein and fault zone within the vertical boundaries of Sunshine's property which may have a portion of its top or apex in Syndicate's claims, and as a result uncertainties have arisen and do now exist as to the legal and equitable rights attaching to the ownership of ore in said vein and fault zone. This vein and fault zone has been commonly referred to as the 'Chester Vein,' and 'Silver Syndicate Vein,' and the 'Silver Syndicate-Chester Vein.' For the purpose of this agreement

it will be referred to as the 'Syndicate-Chester Vein.' "

The next succeeding recital paragraph sets forth the fact that a leasing agreement was in existence between Sunshine and Syndicate for the development of the Syndicate-Chester Vein, (which lease is thereafter canceled in a later paragraph).

The next succeeding recital paragraph provides:

"An agreement dated August 4, 1943 between Syndicate, Sunshine and Polaris Mining Company established a dividing plane as an eastern boundary of Syndicate's extralateral rights on the Syndicate-Chester Vein."

A subsequent recital provides as follows:

"The term 'Syndicate's property,' as used above, and as hereafter used in this contract, refers to Syndicate's mining claims, and to any veins, lodes, ledges or ore bodies which it may own, or in which it may have an interest by virtue of extralateral rights."

A subsequent recital paragraph indicates that the parties' desire to settled the uncertainties that existed to avoid litigation and expensive exploration work connected with the litigation:

". . . and to the end that the mining of any commercial ore found in the Syndicate-Chester Vein may proceed without delay on account of such uncertainties of ownership."

There next follows a paragraph reciting consideration for the agreement, whereupon the parties then agreed with each other as follows:

"1. CONVEYANCE OF 50% INTEREST: Syndicate agrees to convey to Sunshine immediately upon the execution of this agreement an undivided fifty percent (50%) interest in and to all ore and mineral values in all of Syndicate's group of lode mining claims, with unlimited right of ingress and egress, together with a fifty per cent (50%) undivided interest in any veins, lodes, ledges or ore bodies

which Syndicate may own by virtue of extralateral rights.

"2. *EXTRALATERAL RIGHTS*: In consideration of the above conveyance, Sunshine agrees that it will not contest Syndicate's claim to extralateral rights on or in the Syndicate-Chester Vein within Sunshine's vertical boundaries, west of the dividing plane described in said Agreement of August 4th, 1943. Sunshine and Syndicate, for their mutual benefit, agree to the cancellation of the leasing agreement under which Sunshine heretofore has conducted mining operations on a portion of the Syndicate-Chester Vein within Sunshine's Rambo Claim, effective as of August 1st, 1944. For the purpose of this agreement the Syndicate-Chester Vein is identified as that vein or fault encountered by crosscuts in the Sunshine mine at points established by Sunshine survey coordinate intersections as follows:

| Place | | Latitude | Departure |
|---|---|---|---|
| 1900 | Level—Crane Claim | S–78640 | E–75950 |
| 1900 | Level—Sherman Claim | S–78775 | E–76825 |
| 3100 | Level—Rambo Fraction Claim | S–79440 | E–77008 |
| 3100 | Level—Rambo Claim | S–79635 | E–77575 |

Syndicate agrees that it will not claim extralateral rights to any other vein, lode, ledge or ore body within Sunshine's vertical boundaries unless it can be shown with reasonable certainty that such vein, lode, ledge or ore body has its top or apex within the vertical boundaries of Syndicate's claims.

It is recognized that future development and exploration work may disclose the existence of 'blind' veins, lodes, ledges or ore bodies which have their tops or apices beneath the surface and within Sunshine's vertical boundaries, and that such apices might exist close to the Syndicate-Chester Vein or remote from it and upon the south or north side of it. Where it can be shown with reasonably certainty that such a condition exists, Syndicate upon request agrees to quitclaim to Sunshine such blind veins, lodes, ledges or ore bodies. Sunshine and Syndicate agree to cooperate in promptly determining the facts in such cases, and if agreement cannot be reached by this means, both parties agree to promptly submit such apex questions to arbitration as hereinafter provided."

The balance of the 1944 Contract has to do primarily with the method of accounting for the ores produced, the charges allowable against the respective parties, and similar matters, which do not appear to be particularly pertinent to this litigation.

The parties apparently had no significant dispute as to the interpretation of the 1943 or 1944 contracts until some time after 1965. In 1965, Sunshine discovered within the intralimital confines of its original claims what are now called the "625," "H," and "J" veins. It was agreed by all parties at trial that these structures, as a matter of geology, exist within 200 feet of the Silver Syndicate Fault. When Syndicate received knowledge of the existence of these veins, it immediately laid claim to them, and argued that it was entitled to 50% of any mining profits by virtue of contracts between the parties. Sunshine originally agreed with Syndicate, later changed its position to deny any right of Syndicate, later reversed its opinion again, and ultimately decided to refuse to honor Syndicate's claim. As a result, Silver Syndicate brought suit and demanded an accounting and determination of the ownership of those ores.

Hecla Mining Company and Silver Dollar Mining Company joined Sunshine as defendants because of an agreement entered into by these parties early in 1958. This separate and distinct contract is called the "Unit Agreement." It has the effect of pooling all of the claims of the respective defendants and results in a sharing of the profits from mining operations on a per-

centage basis. The unit Agreement specifically exempts from inclusion in the "pool" all property subject to the contracts between Silver Syndicate and Sunshine. Sunshine found itself in the middle of conflicting claims as to the rights to the proceeds from the mining of the 625, H, and J veins. As a precaution, Sunshine established a trust account for these proceeds, until such time as ownership is definitely decided.

At trial, Silver Syndicate proceeded under two primary theories: (1) that it was entitled to 50% of the proceeds from the mining of those veins because they lay within 200 feet of the Syndicate-Chester Vein and, thus, were within the 400 foot "contractual zone" established by the agreements of the parties, and (2) that even if the court were to find its rights limited to the Syndicate-Chester Vein itself, that the 625, H, and J veins were, geologically, expressions of the Syndicate-Chester Vein. The trial judge based his findings of fact and conclusions of law upon the contractual theory only. As a result, the geological claims will not be discussed.

Silver Syndicate contended that the effect of the 1944 Contract was to extend the length of the area which Sunshine had previously agreed to mine under the 1943 Lease while maintaining its 400 foot width throughout the entire extended length. It is contended by Syndicate that such extended length began approximately 1100 feet west of the dividing plane established in the 1943 Contract and continued to the western boundary of the Sunshine property.

Defendants, on the other hand, contended that the effect of the 1944 Contract was to eliminate by implication the 400 foot width zone provided in the 1943 Contract and thus limit Syndicate's interest in Sunshine's ground to the area between the hanging wall and the foot wall of the Silver Syndicate Fault. The trial court stated in his opinion that compelling arguments could be advanced to support either of the foregoing contentions.

We now turn to the findings of the trial court. In arriving at his interpretation of the parties' legal positions, the trial judge first had recourse to the 1943 Contract. He held that the 1943 Contract was unambiguous as a matter of fact and law. He found that the purpose of the 1943 Contract was to prevent expensive litigation, hasten mining operations, and settle all problems of ownership along the Chester Vein. He found that the ultimate effect of the conveyances in the 1943 Contract was that all veins, lodes, ledges or ore bodies found within the Chester Vein as described in the 1943 Contract (i. e., including the 400 foot zone) west of the dividing plane would be the property of Silver Syndicate. The court further found that the definition of the Chester Vein clearly included the Silver Syndicate Fault (as the structure is presently called). The Chester Vein and the Silver Syndicate Fault were, at the time of the execution of the contract, considered and identified as one and the same curved ore bearing geological structure. The court then recognized that the 1943 Lease was one of the "working agreements" contemplated in the 1943 Contract. The court found that the area encompassed in the 1943 Lease, i. e., a 400 foot zone running from the dividing plane west to the westerly end of the Majestic and Rambo claims, was the "Rambo Area" mentioned in the correspondence, conversations and official reports of the parties. The Court concluded that since the trust provisions of the 1943 Lease were never utilized, Syndicate's ownership rights within the Rambo Area were considered by the parties to have been definitely determined.

Thereafter, the court expressly found that the 1944 Contract was ambiguous on its face. The court concluded that it was, therefore, proper to consider conversations, acts, reports, written statements and conduct of the parties to ascertain their intent as to the 1944 Contract. The court found that the parties did not intend to annul the 1943 Contract; that the 1944 Contract did not specifically annul the 1943 Contract, but rather recognizes the existence of the 1943 Contract and contains references thereto. The court further found that the Chester Vein, as referred to in the 1943 Contract,

and the Syndicate-Chester Vein, referred to in the 1944 Contract, were then believed by the parties to be parts of the same geological structure. This was so although geologists at the time of trial considered the Silver Syndicate Fault and the Chester Vein to be two separate geological structures.

Thereafter, based on the court's findings, the court determined the "effect" of the 1944 Contract. The court determined that the 1944 Contract canceled the 60%/40% agreement of the 1943 Lease, and replaced such agreement with a conveyance by Silver Syndicate to Sunshine of fifty per cent of *all* of Syndicate's mineral holdings (thus including extralateral rights and lode mining claims owned by Syndicate wherever located). The court next determined that the 1944 Contract was intended by the parties to apply to the entirety of the Silver Syndicate-Chester Vein within Sunshine's ground, thus increasing the length of the "Rambo Area" to the western boundary of Sunshine's claims. The court next held that neither the 1944 Contract nor the extrinsic evidence as to the intent of the parties indicated any intent to abandon the 400 foot zone. Therefore, the court expressly found that since the Rambo Area created in the 1943 Lease and 1943 Contract was 400 feet wide, the effect of the 1944 Contract in increasing the length of the Rambo Area to the *western* boundary of Sunshine's claims was to carry with it a width of 400 feet.

From all of the foregoing, it should be apparent that although there are substantial mining law overtones to the instant cause, it is, nevertheless, primarily one of contract interpretation. There appears no question but that the parties could have determined the ownership of the ores in the 625, H and J Veins by contractual arrangements.

"Miscellaneous contracts relating to matters arising out of mines and mining operations are governed and controlled by the general law of contracts, in respect to their requisites and validity, construction and operation, performance or breach, and the remedies of the parties thereon.

This is true in respect of the rights, liabilities, and remedies of the parties . . . under a contract for the sale of an interest in certain mineral leases, agreements, and options to purchase . . . [and] under a contract between mine owners creating extralateral rights . . . ." 58 C.J.S. *Mines and Minerals* § 228a.

The first issue presented by the argument of the parties relates to the interpretation of the 1943 Contract. Appellants urge that the trial court erred in construing that 1943 Contract as a conveyance by Sunshine to Silver Syndicate of extralateral rights along the Silver Syndicate Fault (as it is now called) throughout the entire length of Sunshine's claims. They maintain that the recognition of Syndicate's extralateral rights did not occur until the 1944 Contract when Sunshine agreed not to "contest Syndicate's claim to extralateral rights on or in the Syndicate-Chester Vein . . . ." We do not agree that the critical issue is *when* Sunshine conceded Syndicate's rights in the structure, but, rather, the critical question is the extent of the concession, *i. e.*, did the parties agree to a 400 foot zone throughout the length of Sunshine's claims? There appears to be no dispute but that Syndicate has *some* ownership in the structure and, therefore, we do not deem it necessary to rule exactly when that interest arose.

■ Rather, we believe the crucial question is whether the parties agreed to establish a 400 foot zone along the Silver Syndicate Fault within the physical boundaries of Sunshine's intralimital rights. There can be no question that prior to the 1944 Contract some form of 400 foot zone existed. Regardless of whether the parties' rights were considered to be potential or actual rights in the structure, the fact remains that the conveyances and cross-conveyances specifically dealt with the Chester Vein. That vein was *defined* for the purposes of that agreement "to mean the extension of this vein on its strike and dip and all parallel and branching or intersecting veins or other veins and ore bodies for 200 feet to

the north and 200 feet to the south of the center of said Chester Vein." Further, there can be no question but that the 1943 Contract referred to "working agreements" and that the 1943 Lease was one of said "working agreements." Although the 1944 Contract specifically canceled the 1943 Lease, the 1944 Contract does not specifically purport to cancel the 1943 Contract. On the contrary, it specifically refers to the 1943 Contract and appears to incorporate some of its terms. The 1944 Contract does not, however, specifically refer to the 400 foot zone, although it does, nevertheless, contain the terminology of a "vein and fault zone."

Silver Syndicate, of course, maintains and argues that the zone was carried forward from the 1943 Contract. On the other hand, the appellants maintain that the zone was eliminated by implication from the wording of the 1944 Contract. Thus, the trial court was required to ascertain what effect the 1944 Contract had upon the earlier 1943 Contract and was required to draw its conclusion from the implications contained in the instruments and the relevant surrounding circumstances.

 It is well settled that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether that contract be in writing or parol. *Belts v. State Dept. of Highways*, 86 Idaho 544, 388 P.2d 982 (1964); *Coonrod & Walz Constr. Co. v. Motel Enterprises, Inc.*, 217 Kan. 63, 535 P.2d 971 (1975). Thus, the making of a second contract dealing with the subject matter of an earlier contract does not necessarily abrogate the former contract. To have the effect of complete rescission, the new contract must either explicitly rescind the earlier contract, or deal with the subject matter of the former contract so comprehensively as to be complete within itself and to raise the legal inference of substitution, or it must present such inconsistencies with the first contract that the two cannot in any substantial respect stand together. *Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co.*, 226 N.C. 416, 38 S.E.2d 503 (1946). *See also Rosenberg v. D. Kaltman & Co.*, 28 N.J.Super. 459, 101 A.2d 94 (1953); A. Corbin, Contracts § 1296 (1950).

 Since the 1944 Contract specifically refers to and relies upon the 1943 Contract, it is clear that the parties did not intend to rescind it in its entirety. Therefore, since the two contracts may stand together at least to some extent, the following rule of law is applicable.

"A new contract with reference to the subject matter of a former one does not supersede the former and destroy its obligations, except in so far as the new one is inconsistent therewith, when it is evident from an inspection of the contracts and from an examination of the circumstances that the parties did not intend the new contract to supersede the old, but intended it as supplementary thereto." 17A C.J.S. *Contracts* § 395.

*See also Mail-Well Envelope Co. v. Saley*, 262 Or. 143, 497 P.2d 364 (1972); *Fane Dev. Co. v. Townsend*, 381 P.2d 1012 (Okl.1963); *Turner v. Turner*, 242 N.C. 533, 89 S.E.2d 245 (1955); 5 Corbin on Contracts § 1296 (1962). Those provisions of the earlier contract which are not substantially involved in the contradiction (and revoked thereby) still subsist and may be enforced. *Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co., supra.* Once the trial court has ascertained that a total rescission of the earlier contract has not been effected, the two instruments must be read and construed as one in order to determine the intent of the parties and what portion of the agreements are still enforceable. *Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co., supra; International Fuel & Iron Corp. v. Donner Steel Co.*, 221 App.Div. 253, 223 N.Y.S. 110 (1927). In such construction the rules applicable to the interpretation of a single contract are to be utilized. *Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co., supra.*

 When the 1943 Contract and the 1944 Contract are read as one instrument, it is not facially apparent whether the parties intended to preserve the 400 foot zone cre-

ated in the 1943 Contract. Since the composite contract was ambiguous, the trial court properly admitted extrinsic evidence to assist in ascertaining the true intent of the parties. *See Werry v. Phillips Petroleum Co.,* 97 Idaho 130, 540 P.2d 792 (1975); *Rogers v. Hendrix,* 92 Idaho 141, 438 P.2d 653 (1968); *Big Butte Ranch, Inc. v. Grasmick,* 91 Idaho 6, 415 P.2d 48 (1966); *Wood River Power Co. v. Arkoosh,* 37 Idaho 348, 215 P. 975 (1923).

Silver Syndicate presented extrinsic evidence tending to show that the parties to the 1944 Contract at the time of its execution believed that the Chester Vein and the Silver Syndicate Fault were one identical geological structure, and that the parties intended that the 400 foot zone be carried over into the 1944 Contract and its operative extension of the Rambo Area to the western end of Sunshine's claims. Sunshine asserted that the 1944 Contract was not ambiguous, but after receiving an adverse ruling, it offered extrinsic evidence as to the beliefs and intentions of the parties in contradiction to that of Silver Syndicate. On the basis of all the extrinsic evidence, the trial court found that the parties intended to carry over the 400 foot zone from the 1943 Contract into the 1944 Contract.

Among the extrinsic evidence bearing on the intentions and beliefs of the parties at the time of the execution of the 1944 Contract was that relating to statements of one Leisk. Although Leisk had been deceased since the early 1960's, he had been general manager for Sunshine at the time of the 1943 Lease, the 1943 Contract, the 1944 Contract, and immediately thereafter and had been one of the negotiators to those agreements. It was testified that Mr. Leisk stated shortly after the execution of the 1944 Contract that the zone of 400 feet created in the 1943 Contract was intended to be carried over into the 1944 Contract. Leisk allegedly stated that the parties to the contracts had considered that the Chester Vein, as mentioned in the 1943 Contract, and the Syndicate-Chester Vein, mentioned in the 1944 Contract, were considered to be the same geological structure. As to Leisk, the district court specifically found, and

there appears no disagreement among the parties, that Leisk was an engineer of "outstanding ability and integrity." The testimony indicated that during his residency Leisk was perhaps the most admired and respected mine operator in the Coeur d'Alene mining district. He was admired and characterized as a person of unswerving honesty, integrity and fairness. As general manager, he was given complete authority to negotiate, to enter into and to interpret agreements for Sunshine and, as stated by one witness, he "was the Sunshine Mining Company, and ran every part of it."

Appellants assert that the purported statements of Leisk are merely the extrajudicial admissions attributed to a dead man and, as such, are the weakest sort of evidence and should have been disregarded. *See Jephson v. Ambuel,* 93 Idaho 790, 473 P.2d 932 (1970); *Anderson v. Ruberg,* 66 Idaho 417, 160 P.2d 456 (1945); *In re McKenzie,* 54 Idaho 481, 33 P.2d 113 (1934). We agree that the general rule is that statements attributed to persons thereafter deceased are to be regarded with caution. This rule is not, however, a blanket exclusion of all such statements. The determination of the admissibility of testimony relating to purported statements made by persons since deceased and the weight to be given to such testimony is within the discretion of the trial court where, as here, the court was the trier of fact. In the exercise of that discretion, the trial court may consider corroboration of the statements by other sources and the credibility of the testifying witnesses. *See Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975); *Big Butte Ranch, Inc. v. Grasmick, supra; Anderson v. Ruberg, supra; In re McKenzie, supra.* Here there existed other corroborating evidence and the court, therefore, did not err in admitting the testimony relating to the statements allegedly made by Leisk. Since the evidence was admissible, the weight to be given that evidence was exclusively within the province of the trier of fact. We find sufficient evidence to support the findings of the trial court relating to the beliefs of the parties at the time of the contract

negotiation and execution that the Chester Vein and the Silver Syndicate Fault were the same geological structure and further that the parties intended to carry the 400 foot zone over into the 1944 Contract.

Appellants next assert that even if the trial court was correct in finding from the contract, the beliefs and intentions of the parties, and the other extrinsic evidence that the 400 foot zone carried into the 1944 Contract, nevertheless, Syndicate was and is estopped from asserting any claims to the 625, H and J veins. To support that waiver or estoppel argument, appellants rely upon three separate incidents.

■ The first incident occurred in the 1950's when three separate veins (the 08, 09 and 08B Veins) were mined by Sunshine within 200 feet of the Silver Syndicate Fault. It is asserted that Syndicate received knowledge of those mining operations, yet never made any claim to those ores under the 1944 Contract. As to those veins, the trial court found that representatives of Sunshine and Syndicate had informally agreed that those veins would not be claimed by Syndicate since they were not expressions of the Syndicate-Chester Vein. Again, statements attributed to Leisk reflected that agreement because the veins were assumed and agreed to be expressions of the Sunshine-Polaris Vein system and the 1943 and 1944 Contracts were intended to cover rights only in the Syndicate-Chester Vein system. The findings and conclusions of the trial court to the effect that such did not constitute either waiver or estoppel are not clearly erroneous, are supported by the evidence, and, therefore, will not be disturbed on appeal. I.R.C.P. 52(a).

■ The second incident urged by appellants occurred in the late 1950's during the preliminary negotiations for the "Unit Agreement." That "Unit Agreement," as herein stated, had the effect of pooling all of the claims of the parties and resulted in a sharing of the profits from the mining operations on a percentage basis. Silver Syndicate had been asked to join with Sunshine, Hecla and Silver Dollar as a party to that "Unit Agreement." In connection with the negotiations leading toward that agreement, one Pennebaker prepared a report in which he expressed his opinion that Silver Syndicate only had rights under the 1944 Contract within the actual Silver Syndicate Fault itself and not to a zone of 200 feet on either side thereof. It is contended that since Syndicate had full knowledge of this report and never protested the Pennebaker interpretation of the 1944 Contract, it (Silver Syndicate) should now be estopped to urge a claim to the 400 foot zone.

The trial court found that Pennebaker, while trained as a geologist, was neither a trained nor experienced lawyer and, therefore, was not qualified to interpret the legal consequences of contracts. Further, since Syndicate was not a signatory party to the "Unit Agreement," Syndicate had no compelling reason to reply or object to the Pennebaker report. The court found no detrimental reliance on the part of any of the actual signatory parties to the "Unit Agreement" on Syndicate's lack of reply to the Pennebaker report. We find no error in the trial court's findings or conclusions relating to the non-estoppel or non-waiver on the part of Silver Syndicate in relation to the actions of Silver Syndicate relating to the "Unit Agreement."

■ Sunshine next asserts that an agreement entered into between Syndicate and Big Creek Apex Mining Company constitutes evidence upon which the trial court should have concluded that Syndicate had waived or was estopped to assert the claims involved in the case at bar. That contract between Syndicate and Big Creek noted the existence of the 1944 Contract between Syndicate and Sunshine, but made no mention of a zone owned by Syndicate within the intralimital rights of Sunshine. The trial court noted that the agreement between Syndicate and Big Creek referred to an *area* within a plane and the court concluded that this did not amount to a representation by Syndicate that it owned only a plane, as opposed to a zone, within Sunshine's intralimital rights. Hence, the court concluded that Sunshine had not waived the claims asserted in the case at bar and was

not estopped to do so. We view the appellants' assertions of trial court error in this regard as going to the weight of the evidence. The findings of the trial court in this regard are not clearly erroneous and will, therefore, not be disturbed on appeal. I.R.C.P. 52(a).

■ We deal with one final issue raised by appellant Silver Dollar Mining Company, i. e., that since the 1944 Contract did not, on its face, give notice of the 400 foot zone claimed by Silver Syndicate, Silver Dollar is a good faith purchaser for value. Thus, it is asserted any claim to that zone by Syndicate would not be valid as against Silver Dollar. Respondent Silver Syndicate correctly notes the failure to raise such issue in the court below, and we do not agree with the argument of Silver Dollar that the good faith purchaser argument was raised by implication during the litigation of the estoppel issues in the court below. Issues not raised in the trial court and presented for the first time on appeal will not be considered or reviewed. E. g., *Frasier v. Carter*, 92 Idaho 79, 437 P.2d 32 (1968).

Our disposition of the preceding issues renders unnecessary consideration of the remaining assignments of error. The judgment of the trial court is affirmed.

DONALDSON, C. J., McFADDEN, J., and SCOGGIN, J. Pro Tem., concur.

BAKES, Justice, dissenting:

I agree with the majority that this case is "primarily one of contract interpretation." The parties entered into two contracts. The trial court found, and the majority of this Court agrees, that the "1943 contract

was unambiguous as a matter of fact and law." *Ante* at 1020. It is the trial court's conclusion that the 1944 contract was ambiguous, affirmed by the majority, with which I disagree.

In the 1943 contract, the parties comprised their possible conflicting claims to the rich body of ore which Sunshine had found in the Syndicate-Chester vein within the interlimital boundaries of the Majestic and Rambo claims. It was thought that Silver Syndicate might have a legitimate claim of extralateral rights in those ore bodies, and so the parties agreed to divide the profits from the mining of that ore body within that carefully defined area, being not only 1,100 feet of the vein itself, to which Silver Syndicate's extralateral rights would have applied, but also to a zone 200 feet to the north and the south of that vein. That 400-foot zone was to run from the dividing plane on the east, to the westerly end of the Majestic and Rambo claims, a distance of 1,100 feet. However, Sunshine Mine owned additional mining claims west of the Majestic and Rambo claims, and the 1943 agreement did not apply to them.

After operating the 1943 agreement, Silver Syndicate expressed dissatisfaction with the arrangements, which resulted in the parties entering into the 1944 agreement. However, unlike the 1943 agreement, the 1944 agreement did not give Silver Syndicate rights in a zone 200 feet on either side of the Syndicate-Chester vein; rather, in that 1944 agreement Sunshine merely agreed "not to contest Syndicate's claim to extralateral rights on or in the Syndicate-Chester Vein . . . ."[1]

1. The pertinent language of the two agreements is as follows:

The 1943 agreement:
"8. Chester vein as above identified shall be considered to mean the extension of this vein on its strike and dip and all parallel and branching or intersecting veins or other veins and ore bodies for 200 feet to the north and 200 feet to the south of the center of said Chester vein. Displacement by faulting of the Chester vein zone or local pinching or absence of ore in the Chester vein zone shall

not be deemed a termination of its extension on its strike or dip."
The 1944 agreement:
"2. EXTRALATERAL RIGHTS: BLIND VEINS: In consideration of the above conveyance, Sunshine agrees that it will not contest Syndicate's claim to extralateral rights on or in the Syndicate-Chester vein, within Sunshine's vertical boundaries, west of the dividing plane described in said Agreement of August 4th, 1943. Sunshine and Syndicate, for their mutual benefit, agree to the cancellation of the leasing arrangement under

The majority upholds the trial court's conclusion that the 1944 agreement was ambiguous. There was nothing ambiguous about the language wherein Sunshine agreed not to "contest Syndicate's claim to extralateral rights on or in the Syndicate-Chester Vein . . . ." The mere fact that Sunshine had, in the 1943 agreement, agreed to Syndicate's claim to extralateral rights in the Majestic and Rambo claims, plus an additional 200 feet on either side thereof, does not mean that the failure of the 1944 agreement to create the same 200-foot zone on either side of the Syndicate-Chester Vein west of the Majestic and Rambo claims creates an ambiguity. The majority admits, *ante* at 235, "the 1944 contract does not, however, specifically refer to the 400 foot zone . . . ." In fact, in the same paragraph 2 of the 1944 agreement, Syndicate agreed to quitclaim to Sunshine any " 'blind' veins, lodes, ledges or ore bodies which have their tops or apices beneath the surface and within Sunshine's verticle boundaries," and Syndicate recognized that "such apices might exist close to the Syndicate-Chester vein or remote from it and upon the south or north side of it." This language cannot be reconciled with a claim by Syndicate of a 200-foot zone on either side of the vein.

There is no ambiguity in the 1944 agreement. There is nothing in it to suggest that the 400-foot zone created in the 1943 agreement was extended to the west of the Majestic and Rambo claims. The trial court erred, in my view, in holding the 1944 agreement to be ambiguous and admitting extrinsic evidence of what the parties intended. I would reverse and remand the matter to the district court with directions that the trial court enter findings of fact and conclusions of law and judgment that the 1944 contract did not create a 400-foot zone along the Syndicate-Chester vein, west of the Majestic and Rambo claims, but that it merely acknowledged "Syndicate's claim to extralateral rights on or in the Syndicate-Chester Vein." However, that would not preclude Syndicate from claiming the ores in the veins in question, the "625", "H", and "J" veins. Silver Syndicate's second complaint sets forth an additional claim to those ores based upon the fact that those veins were, geologically, expressions of the Syndicate-Chester vein and thus the ore was theirs by virtue of their extralateral rights. The trial court made no findings of fact or conclusions of law on that theory because it found the contractual theory to be dispositive of the case. Syndicate should still be entitled to a ruling upon the geological claims that it had made.

which Sunshine heretofore has conducted mining operations on a portion of the Syndicate-Chester vein within Sunshine's Rambo claim, effective as of August 1st, 1944. For the purpose of this agreement the Syndicate-Chester vein is identified as that vein or fault encountered by crosscuts in the Sunshine Mine at points established by Sunshine survey coordinate intersections, as follows:

| Place | Latitude | Departure |
| --- | --- | --- |
| 1900 Level—Crane Claim | S–78640 | E–75950 |
| 1900 Level—Sherman Claim | S–78775 | E–76525 |
| 3100 Level—Rambo Fraction Claim | S–79440 | E–77008 |
| 3100 Level—Rambo Claim | S–79635 | E–77575 |

"Syndicate agrees that it will not claim extralateral rights to any other vein, lode, ledge or ore body within Sunshine's vertical boundaries unless it can be shown with reasonable certainty that such vein, lode, ledge or ore body has its top or apex within the vertical boundaries of Syndicate's claims.

"It is recognized that future development and exploration work may disclose the existence of 'blind' veins, lodes, ledges or ore bodies which have their tops or apices beneath the surface and within Sunshine's vertical boundaries, and that such apices might exist close to the Syndicate-Chester vein or remote from it and upon the south or north side of it. Where it can be shown with reasonable certainty that such a condition exists, Syndicate upon request agrees to quit claim to Sunshine such blind veins, lodes, ledges or ore bodies. Sunshine and Syndicate agree to cooperate in promptly determining the facts in such cases, and if agreement cannot be reached by this means, both parties agree to promptly submit such apex questions to arbitration as hereinafter provided."