673 P.2d 76

**James OLMSTEAD and Joan Elmstead, husband and wife, Plaintiffs-Respondents,**

**v.**

**HEIDELBERG INN, INC., an Idaho corporation, Defendant-Appellant.**

**No. 14039.**

Court of Appeals of Idaho.

· Nov. 22, 1983.

James L. Kennedy, Jr. of Kennedy, du-Pont & Crabtree, Ketchum, for defendant-appellant.

Bruce J. Collier of Kneeland, Laggis, Korb, Collier, Benjamin & Russell, Ketchum, for plaintiffs-respondents.

SWANSTROM, Judge.

James and Joan Olmstead bought into the Heidelberg Inn at Ketchum, Idaho, and took over operation of the motel from the owners, Ross and Nancy Fitzpatrick, in July 1977. The venture proved dissatisfying to both couples and the Olmsteads wanted out. When their efforts to resign and to obtain payment for corporate stock they had purchased were resisted by the Fitzpatricks, the Olmsteads brought this declaratory judgment action against the corporation. The corporation counterclaimed seeking damages and rescission of the contract, alleging that the Olmsteads had breached their agreement in a number of ways and were guilty of misrepresentation, mismanagement and negligence. The district judge, who tried the case without a jury, faced a formidable task of unsnarling conflicting contract provisions and contradictory testimony of the parties. The judge found in favor of the Olmsteads and the corporation has appealed. We vacate the judgment and remand for further proceedings.

The issues on appeal are: (1) Did the district judge err in focusing on one document, to the exclusion of others, in determining what the parties' agreement was concerning (a) the length of time the Olmsteads were bound to remain as managers of the motel, and (b) the terms and conditions which would govern when and at what price the Olmsteads would be paid for their corporate stock by the majority shareholders—the Fitzpatricks—in the event the Olmsteads ceased to be managers? (2) Did the judge err in calculating the price which the corporation was required to pay to the

Olmsteads for redemption of their stock? (3) Did the district judge err in ruling against the corporation on each of its counterclaims? (4) Did the judge err in determining when interest would start to accrue on the redemption price for the Olmsteads' stock? (5) Were costs properly awarded at trial? (6) Is either party entitled to costs and attorney fees on appeal?

## FACTUAL BACKGROUND

The Fitzpatricks had owned and operated the Heidelberg Inn for several years. In 1977 they were looking for someone who could operate the motel and become co-investors. The Olmsteads learned of the opportunity and met with the owners. As a result of these discussions it was agreed that the Olmsteads would come to Ketchum to manage the Heidelberg Inn. After quitting their jobs and selling their home in Pullman, Washington, the Olmsteads and their children moved to Ketchum and took over management of the motel in July 1977. The Fitzpatricks in turn moved to Boise.

At this point, the agreement between the Olmsteads and Fitzpatricks remained oral and the form of their business association had not yet been decided. The Olmsteads envisioned a partnership; however, Ross Fitzpatrick, a certified public accountant, decided that a corporation would be better. Thus, Heidelberg Inn, Inc. was duly organized as an Idaho corporation. The Olmsteads were the incorporators and first officers.

Fitzpatrick drafted two documents intended to embody the parties' agreement. The first of these was a contract of sale, dated August 11, 1977, between the Fitzpatricks as sellers and Heidelberg Inn, Inc. as buyer. It was signed by the Fitzpatricks and by Mr. and Mrs. Olmstead, who signed for the corporation as the president and secretary-treasurer respectively. The documents in the record are somewhat confusing, making it difficult to distinguish the true relationships of the individuals and the corporation. However, it appears that the Fitzpatricks transferred all the real and personal property of the motel to the corpo-

ration. In exchange they received 8,500 shares of stock and $30,059 from the corporation. The Olmsteads had contributed the $30,059 to the corporation, for which they received the other 1,500 shares of authorized corporate stock. The contract of sale used the terms "Buyer" and "Buyers" interchangeably, at times apparently referring to the corporation and at times referring to the Olmsteads personally. It purported to cover the sale of the motel property to the corporation and to specify the corporation's duty to maintain the property, assume an existing mortgage and pay other expenses of ownership. It required the corporation to purchase blocks of the Fitzpatricks' shares of stock each year until the corporation owned seventy-five percent of all shares. The contract of sale further specified how the price would be computed. Until the corporation completed purchase of seventy-five percent of the stock, one of the Fitzpatricks was to be on the board of directors and was to serve as secretary-treasurer of the corporation. No mention was made of the 1,500 shares issued to the Olmsteads, nor did the contract give them, individually, the right to purchase any of the Fitzpatricks' shares.

The other document prepared by Fitzpatrick was a "Contract of Employment," also dated August 11, 1977. This was between the Heidelberg Inn, Inc. as "Employer" and the Olmsteads as "Employees." On this document, Ross Fitzpatrick signed as "Secretary-Treasurer, Heidelberg Inn, Inc." This document made the Olmsteads managers of the motel subject, however, to the control and supervision of Ross Fitzpatrick. The document mentioned a seven-year term of employment. It specified the Olmsteads' duties and compensation. It also provided for mandatory redemption of their shares of stock by the corporation "[i]n the event that they elect to cease active management of the [motel] . . . ." A formula for computing the redemption price from yearly gross receipts and a six-month deadline for payment were set out in the document.

Together the contract of sale and contract of employment were intended to ex-

press the two couples' overall agreement. Later, Ross Fitzpatrick realized the contract of sale was not satisfactory and he had an attorney draft an "Addendum Contract of Sale." This document, executed in September 1977, stated in part as follows:

> The [corporation] and [the Fitzpatricks] have previously entered into a written agreement entitled "Contract of Sale" executed on the 11th day of August, 1977. However, due to certain ambiguities that exist between the rights, duties and obligations of the respective parties thereto, this addendum contract is by reference incorporated in said original Contract of Sale and is intended to be part thereof for the purpose of eliminating any ambiguity or doubt as to the rights, liabilities or positions of each party.

The addendum, like the contract of sale, named the Fitzpatricks as sellers and the corporation as buyer. Both the Fitzpatricks and the Olmsteads signed the addendum in the same manner as they had signed the contract of sale. This document expressly corrected some obvious errors and ambiguities in the original contract of sale. For example, it expressly stated that it was the Olmsteads, not the corporation, who had the right to purchase the stock issued to the Fitzpatricks. The addendum provided that the election by the Olmsteads to cease managing the motel "pursuant to the terms of that employment contract" would constitute a default of the addendum contract. In that event, one of two formulas was to be applied to determine the redemption price of "any stock previously purchased by the Olmsteads." If the Fitzpatricks exercised their option upon default to terminate the agreement, they were given the right to purchase the stock at a price determined by a formula similar to the one in the contract of employment. If the Olmsteads requested termination of the agreement following default, a different formula was to be used to determine the price at which the Fitzpatricks were required to repurchase the stock.

Later, still unsatisfied that the parties' agreement was properly expressed, Fitzpatrick drafted another document which we will call the "Stock Purchase Agreement." This agreement, while dated August 11, 1977, was signed by the Fitzpatricks and the Olmsteads months later. Both Olmstead and Fitzpatrick testified at trial that the parties intended this document to supersede both the contract of sale and the addendum. The stock purchase agreement covered the same subject matter as the earlier two documents.

The uncertain start of the business relationship presaged future problems between the Fitzpatricks and the Olmsteads. Ross Fitzpatrick, being the designated supervisor and being more experienced in management, directed how the business was to be conducted. The Olmsteads, who had no experience in operating a motel or with the required bookkeeping procedures, soon incurred the displeasure of the Fitzpatricks. The Fitzpatricks complained that the rooms were not kept clean, the grounds were unkept and the Olmsteads were not maintaining the property adequately. James Olmstead initially had difficulty with some accounting procedures and Ross Fitzpatrick made several revisions of bookkeeping methods for him to follow. The Olmsteads began to resent what they regarded as "intrusions" into their affairs by the Fitzpatricks.

The Olmsteads' dissatisfaction led them to investigate other business and employment opportunities. Finally, on January 1, 1979 the Olmsteads sent a letter to Ross Fitzpatrick, informing him of their intent to resign, effective January 1, 1979. The letter also said the Olmsteads would stay "no later than April 1, 1979" at the same rate of pay. At trial the Olmsteads argued that their letter amounted to a resignation, effective immediately, with an offer to remain as "interim" managers until April 1. The corporation, on the other hand, contended that the letter did not constitute a resignation because the Olmsteads did not unequivocally express their intent to resign. In response to the Olmsteads' letter, Ross Fitzpatrick delivered a letter of dismissal to them on January 15, 1979 on behalf of the corporation. Whether the Olmsteads re-

signed on January 1, 1979 or were discharged two weeks later, and whether the Olmsteads even had the right to resign at that time, were major contested issues at trial. These issues affected the price at which the Olmsteads' stock would be redeemed. Depending upon which provision of the various documents applied, the amount that the Olmsteads were entitled to receive for their 1500 shares of stock varied by more than $35,000. Whether the corporation or the Fitzpatricks were required to redeem the Olmsteads' stock was also at stake.

It should be noted that the Olmsteads originally brought this action to determine their rights under the contract of employment. In its counterclaim the corporation alleged that the parties' entire agreement was also comprised of other documents. In determining that the Olmsteads were entitled to relief, the court excluded the other three documents whose provisions may have affected the parties' rights and duties. The court ignored those documents because the contract of employment was the only agreement, at least on its face, between the Olmsteads as individuals and the corporation.

The district court held that the formula in the employment contract should be applied to determine the redemption price of the Olmsteads' stock. The court also determined that the Olmsteads had resigned but had not breached the contract and were not guilty of misrepresentation. Accordingly, the court set the redemption price at $60,629. The court held, as the Olmsteads had claimed, that this amount was due and payable six months after the Olmsteads quit their job.

On appeal the corporation argues that the district court erred in not taking the stock purchase agreement into consideration in determining what the parties' agreement was concerning (a) the Olmsteads' term of employment and (b) the redemption price of the Olmsteads' stock. We agree that the judge erred, but in this instance the error was harmless.

## REDEMPTION FORMULA ISSUE

■ The goal in construing a contract is to determine the intent of the parties. *Rutter v. McLaughlin,* 101 Idaho 292, 612 P.2d 135 (1980). In doing so, a court may scrutinize the circumstances surrounding the contract's formation. *Transamerica Leasing Corp. v. Van's Realty Co.,* 91 Idaho 510, 427 P.2d 284 (1967). Here the question is whether the stock purchase agreement was intended to become part of the agreement.

In this case the circumstances show that all four of the contracts shared a common nexus. They defined or modified the rights of the Olmsteads and the Fitzpatricks regarding the motel operation. Each document was executed by both couples, with the exception of the contract of employment—which Nancy Fitzpatrick did not sign. These two couples controlled the corporation, and together they effectively could modify any agreement between the corporation and either of the couples. Therefore, the real dispute, under the facts of this case, is between the Fitzpatricks and the Olmsteads. Although the corporation is the defendant here, and is a separate legal entity as far as the rest of the world is concerned, its significance in this case is that it represents the vehicle chosen by the Fitzpatricks and the Olmsteads to conduct their business together. The four individuals are the sole shareholders and officers. Consequently, the fact that the corporation is a named party to the contract of employment, but not to the stock purchase agreement, is of little importance in determining what these documents mean. The course of dealings between the parties, as evidenced by the four agreements and the internal evidence of the agreements themselves, amply demonstrate the need to determine the overall agreement between the Fitzpatricks and the Olmsteads by reference to all the documents which concerned and affected their business relationship.

In *Silver Syndicate, Inc. v. Sunshine Mining Co.,* 101 Idaho 226, 235, 611 P.2d 1011, 1020 (1979), the Idaho Supreme Court offered the following guidance on construing multiple documents:

It is well settled that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether that contract be in writing or parol. *Belts v. State Dept. Of Highways,* 86 Idaho 544, 388 P.2d 982 (1964); *Coonrod v. Walz Constr. Co. v. Motel Enterprises, Inc.,* 217 Kan. 63, 535 P.2d 971 (1975).

. . . .

'A new contract with reference to the subject matter of a former one does not supersede the former and destroy its obligations, except in so far as the new one is inconsistent therewith, when it is evident from an inspection of the contracts and from an examination of the circumstances that the parties did not intend the new contract to supersede the old, but intended it as supplementary thereto.' 17A C.J.S. CONTRACTS § 395 . . . .
Once the district court has ascertained that a total rescission of the earlier contract has not been effected, the two instruments must be read and construed as one in order to determine the intent of the parties and what portion of the agreements are still enforceable. [Citations omitted.]

In this case, it is clear from the language of the addendum that it modified the original contract of sale. The addendum also referred to the contract of employment. The addendum had specific provisions concerning the formula which would be used to determine the redemption price of the Olmsteads' stock in the event they elected to resign. Other language in the addendum showed that the Olmsteads, as "minority stockholders," agreed to be bound by its provisions even though they apparently signed it as corporate officers. The addendum provisions, being later in time and more specific, would have controlled over the provisions in the contract of employment.

■ However, both the contract of sale and the addendum were later replaced by the stock purchase agreement. As noted earlier, James Olmstead and Ross Fitzpa-

trick testified that they intended the stock purchase agreement to supersede the contract of sale and the addendum. This fact being uncontested, we accept it as true. The stock purchase agreement therefore replaced the modified contract of sale. We conclude that the stock purchase agreement must be read with the contract of employment to discover the parties' whole contract. This conclusion is further supported by testimony of James Olmstead that certain changes in the contract of employment were made at the time the stock purchase agreement was entered into. The district court erred by construing the contract of employment separately from the stock purchase agreement.

■ However, the error appears to be harmless. In reading the contract of employment and the stock purchase agreement together, we see their redemption provisions as being complementary to each other. The contract of employment provides the following:

In the event that [the Olmsteads] elect to cease active management of the Heidelberg Inn, their shares of stock shall be purchased by the [corporation]. Compensation for each share of this stock will be computed by multiplying gross annual income of the latest twelve months of the operation of the Heidelberg Inn by 4.0 and subtracting the outstanding balance of the first mortgage and dividing by the total number of shares of stock outstanding. [The corporation] will have six months to complete payment for this stock. However, [the Olmsteads] will immediately vacate the premises of the Heidelberg Inn upon termination, voluntary or involuntary.

The stock purchase agreement provides:

In the event that the contract of employment between Heidelberg Inn, Inc. and [the Olmsteads] is terminated at the option of [the Fitzpatricks], [the Fitzpatricks] shall have the right to purchase all stock owned by the [the Olmsteads] in Heidelberg Inn, Inc. The agreed upon purchase of the stock, in this event, shall be computed at four times the motel's

gross annual income, as previously described herein.

In other words if the Olmsteads resigned their positions, the corporation would be required to purchase their stock for an amount computed with the formula in the contract of employment. However, if the Fitzpatricks terminated the contract of employment with the Olmsteads, the Fitzpatricks would have the right to purchase the stock owned by the Olmsteads. The price would be computed by the formula set out in the stock purchase agreement.

Of course, the formulas are not the same; but that does not mean there is conflict between these provisions. The provisions serve different purposes. The formula in the contract of employment applies in the event the Olmsteads resigned. The formula in the stock purchase agreement applies in the event that the Fitzpatricks terminated the Olmsteads' contract of employment. Similarly, the figure for the motel's gross annual income must be determined in one of two ways, depending upon whether the redemption provision of the contract of employment or the redemption provision of the stock purchase agreement applies.

The district judge construed the contract of employment as allowing the Olmsteads to elect to terminate their employment with the corporation. We have already set out the language from the document upon which the judge based this interpretation. The contract of employment also recited:

> It is agreed by both parties that this employer-employee relationship shall continue for seven (7) years from this date, assuming competent performance of duties by Employees.

The district judge determined that the "seven year period provided in the Contract of Employment was identified by the parties for convenience only and it relates at least in part to a period of depreciation which was familiar to the draftsman, Ross Fitzpatrick." He interpreted the "seven year" term as an "outside limitation for employment" that was qualified by the language allowing the Olmsteads the right to "elect to cease active management of the [motel]." In construing the contract of employment the district judge stayed within the four corners of that instrument. He made no reference to the stock purchase agreement. The corporation argues that this was error which resulted in the district judge misconstruing the parties' agreement. However, the stock purchase agreement contains no language specifying what happens in the event that the Olmsteads elect to cease active management of the motel. This contingency is provided for only in the contract of employment. Provisions in the stock purchase agreement for redemption of the Olmsteads' stock apply under other circumstances, and they do not help to modify or to explain the complementary provisions in the contract of employment.

It is true that, under the former addendum contract of sale, a resignation by the Olmsteads would clearly have been a default in the parties' agreement. It expressly so provided. Fitzpatricks and not the corporation would have been the parties responsible for redeeming the Olmsteads' stock. However, it is clear from the evidence that after the stock purchase agreement was signed the addendum had no further force and effect.

The undisputed evidence shows that when the Fitzpatricks sought to replace the addendum with a new agreement they consciously considered certain changes which the Olmsteads wanted made in the contract of employment. As a result of these negotiations the parties made certain deletions and interlineations in the contract of employment. These changes were initialed and agreed to by the parties. At the same time the Olmsteads agreed to sign the stock purchase agreement. We must assume as a result of these actions that, after these changes were made, the contract of employment and the stock purchase agreement correctly reflected the overall agreement of the parties. However, even when the two documents are construed together, only the language in the contract of employment applies. The error in disregarding the stock purchase agreement does not alter the result.

■ We have carefully reviewed the testimony and the documentary evidence concerning the evolution of the parties' final agreement. In negotiating that agreement the parties consciously chose to set aside the clear provisions of the addendum which equated a resignation to a default. In doing so the parties opted to reinstate, with changes, the language in the contract of employment. Based upon our examination of that language and of the testimony of the parties about the events leading to the final agreement, we cannot say that the district court erred in ruling that the Olmsteads were entitled to resign their employment without breaching their agreement.

■ The district judge also found, upon conflicting evidence, that the Olmsteads did resign their employment. The next question therefore is whether the Olmsteads' letter of January 1, 1978 constituted a resignation on that date. In part, this letter said:

> I wish to inform you, therefore, that it is our intention to leave the Heidelberg Inn corporation according to the terms of agreement signed by the Fitzpatricks and the Olmsteads. We will stay no later than April 1, 1979.
>
> For that period of time, during which we remain here as managers, but not stockholders, we expect to be paid $1,000. per month, adjusted to 10% of the gross income as of the time of our leaving.
>
> . . . .
>
> The date of our resignation as managers in the employ of this corporation is the date this letter bears, January 1, 1979.

The district judge determined that the Olmsteads "effectively resigned" their employment on January 1, 1979 when they sent their letter "and they offered to stay on as interim managers for a period not to exceed April 1, 1979." In part, the judge based his conclusion on a finding that prior to January 1, 1979 the Olmsteads had assured Ross Fitzpatrick "that while they could not be sure that they would stay on during the indefinite future as employees of the corporation, they would not leave the corporation

in a position where it would not have a resident manager during the ski season." The district judge further found that the Olmsteads provided services to the motel as managers on an interim basis after January 1 and until January 15, when they received the letter in response from Ross Fitzpatrick. This letter said that the Olmsteads' "offer to stay on as managers . . . is not accepted" and that their employment "is terminated."

We hold that, under all of the circumstances shown by the record, the Olmsteads' letter gave a reasonably clear indication of their intent to resign effective as of January 1, 1979. Therefore, we conclude that the district judge did not err in his ruling on this issue. It follows that he applied the correct formula specified by the parties in their agreement for determining the redemption price of the Olmsteads' stock.

## REDEMPTION CALCULATION ISSUE

We now examine the corporation's assertions that the district court erred in calculating the redemption price of the Olmsteads' stock. The calculation is based upon the amount of the corporation's 1978 gross receipts. Various figures were supplied to the court, with the Olmsteads contending that those figures derived from a "monthly reconciliation approach" should be used rather than the figures taken from the corporation's general ledger.

The district judge rejected the general ledger approach as "unreliable" because he believed a $7,000 adjustment made by Ross Fitzpatrick in June 1978 to the corporation's general ledger was not sufficiently explained. The adjustment resulted in decreasing the 1978 gross income by approximately $7,000 and increasing the 1977 gross income by the same amount. The effect of the adjustment would be to reduce the redemption price for the Olmsteads' stock. Except for this adjustment, the two accounting approaches result in approximately the same gross income figures for 1978. The district judge held that the reduction of the 1978 income was not justified "in light of the definition of gross income

found in the Contract of Employment." That definition is:

> Gross, or gross income, or annual gross income of the Heidelberg Inn is defined as all monies collected through the normal course of business of operation of the Heidelberg Inn (motel). This includes but is not limited to room rental income, forfeited deposits and collections from coin operated machines.

Mr. Maurer, a certified public accountant, was a witness for the Olmsteads. Mr. Maurer testified that "it appeared there didn't seem to be any explanation for [the adjustment]." Yet he acknowledged that the $7,000 which had been included in 1977 income by Ross Fitzpatrick's adjustment was received by the corporation in 1977. Ross Fitzpatrick, also a certified public accountant, testified later. The amount, he explained, represented advance room deposits which the corporation became entitled to retain in 1977, but which had been carried over onto the 1978 records. He made the adjustment to segregate deposits earned in 1977 from deposits not earned until 1978. Deposits not earned by the end of 1977 remained in 1978 income when the adjustment was made. Ross Fitzpatrick made this adjustment before the parties became embroiled in this dispute. About the same time, he made some changes in the accounting procedures so that, as advance deposits were thereafter earned or applied to customers' accounts, they were recorded as income. As a result it was not necessary to make another year-end adjustment after 1978.

■ We believe that Ross Fitzpatrick's testimony constituted substantial competent evidence which was not contradicted by the earlier testimony of the other expert witness. According to undisputed testimony, not only was the money received in 1977, but it was earned in 1977. The definition of gross income in the contract of employment actually supports that testimony. Even Mr. Maurer ultimately agreed that if the adjustments were accurate and properly explained, the general ledger approach would be the most accurate. We

conclude that the general ledger approach provided the more accurate figures for calculating the 1978 gross receipts of the corporation than did the monthly reconciliation approach adopted by the district court. Therefore, while we uphold the district judge's determination as to the applicable redemption formula, we deem it necessary to remand the case with the instruction that the general ledger approach be used in applying the formula.

## COUNTERCLAIM ISSUES

■ Next, we must examine the corporation's contention that the district judge erroneously denied all relief on the counterclaim. Normally, our task on appeal would be to determine whether all the evidence bearing on a counterclaim is sufficient to support the judge's findings. In this case, however, the judge made no specific findings in regard to the various items of the counterclaim. Ross Fitzpatrick testified to and submitted some documentary evidence on fourteen different items, including claims for the Olmsteads' failure to return corporate funds used to pay personal debts, money owed upon settlement of the Olmsteads' salary and personal accounts, and losses caused by mismanagement or negligence. Mr. Olmstead testified in response to some, but not all of the claims. His testimony was sufficient evidence upon which the court could have made a finding in his favor on one or more specific items. Also we recognize that the evidence submitted by the corporation in support of claims for a real estate sales commission, for attorney fees and for general and punitive damages was insufficient as a matter of law. However, the Olmsteads' did not deny they owed the corporation for some of the items claimed in the stated account between the parties. In the absence of any findings by the district court, we are unable to sustain a mere blanket denial of the counterclaim. We therefore vacate the district court's judgment with instructions for the court to consider the evidence which dealt with the counterclaim and to make

specific findings in regard to the separate claims made therein.

### INTEREST ACCRUAL ISSUE

■ The corporation has alleged as error the district court's award of prejudgment interest to the Olmsteads on the redemption price of their stock. Allowance of prejudgment interest on the net sum found due, after deducting any sums the Olmsteads may owe under the counterclaim, is appropriate under I.C. § 28–22–104. The contract of employment specifically gave the corporation six months to complete payment of the redemption price for the stock. The money owed to the Olmsteads, therefore, became due six months after they resigned. Interest would begin to accrue at that point, as the district judge correctly concluded.

### COSTS AND ATTORNEY FEES

Finally, the corporation asserts that the district court erred in its award of costs to the Olmsteads at trial. It is not necessary for us to address this issue because we are vacating the judgment and the order awarding costs. Upon remand, when a new judgment is entered the matter of costs will be resubmitted. Each party has requested an award of attorney fees on appeal under I.C. § 12–121. Neither party wholly prevailed in this appeal. While this circumstance does not preclude an award of fees, we decline to award fees because we note that this appeal was neither brought nor defended frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979). No costs allowed.

The judgment and order awarding costs are vacated. The cause is remanded for further proceedings as directed in this opinion.

WALTERS, C.J., and BURNETT, J., concur.