916 P.2d 1264

**The WALTER E. WILHITE REVOCABLE LIVING TRUST; and Larry A. Wilhite, as Trustee of the Walter E. Wilhite Revocable Living Trust, Plaintiffs, Counter–Defendants, Third Party Defendants–Respondents–Cross Appellants,**

v.

**NORTHWEST YEARLY MEETING PENSION FUND, Defendant–Counterclaimant–Third Party Plaintiff–Appellant–Cross Respondent.**

No. 21005.

Supreme Court of Idaho, Boise, September 1995 Term.

April 10, 1996.

Rehearing Denied June 4, 1996.

Moffatt, Thomas, Barrett, Rock & Fields, Chtd., Boise; Ellsworth, May, Sudweeks, Stubbs, Ipsen & Perry, Boise, for appellant. Loren C. Ipsen argued.

Eismann Law Offices, Caldwell, for respondents. Richard B. Eismann argued.

SILAK, Justice.

The plaintiff, the Walter E. Wilhite Revocable Living Trust (Trust), brought this action seeking to rescind a deed of land to the defendant, the Northwest Yearly Meeting Pension Fund (Pension Fund). The deed was given to the Pension Fund allegedly to satisfy a pre-existing debt. The Pension Fund counterclaimed praying that if the deed were rescinded, the debt and security therefor should be reinstated. The district court voided the deed, but refused to reinstate the debt. The Pension Fund appealed. The Trust cross-appealed the district court's refusal to instruct the jury as to its claim for trespass and punitive damages.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In August of 1979, Sunny Ridge Manor (Sunny Ridge) approached the Pension Fund for a loan to finance the construction and operation of a retirement home near Nampa, Idaho. At the time, Walter Wilhite was both treasurer for Sunny Ridge and a member of the Pension Fund's Investment Committee. The Pension Fund's Investment Committee approved a $100,000 loan to Sunny Ridge.

From the outset, Sunny Ridge experienced financial difficulties. In order to alleviate these financial woes, Walter Wilhite assigned some personal commercial options to Sunny Ridge to aid in its acquisition of some logging property near Riggins. In exchange, Sunny Ridge executed a promissory note to Walter and Kathleen Wilhite in the amount of $340,000. To secure the note, the Wilhites took a second mortgage on the property. This mortgage was not recorded. The contract between the original buyer and seller held the first position (Overlander contract).

On June 1, 1981, Sunny Ridge renegotiated the $100,000 loan with the Pension Fund and executed a new note in the amount of $109,600. Later that year, Sunny Ridge borrowed an additional $100,000 and executed another promissory note in favor of the Pension Fund. A protection warranty deed covering the Riggins property was executed to secure this note.

In 1982, another attempt was made to resolve Sunny Ridge's financial plight. The Wilhites proposed that they, Sunny Ridge, and the Pension Fund enter into an escrow agreement (first escrow) to transfer title to the Wilhites. In the first escrow, the parties placed (1) a corporate warranty deed executed by Sunny Ridge transferring the Riggins property to the Wilhites; (2) a promissory note executed by the Wilhites payable to the Pension Fund in the amount of $214,120 and due on January 15, 1984 (January note); and (3) a protection warranty deed from the Wilhites pledging the Riggins property as security for the note.

Later that year, Walter Wilhite found a purchaser, Moria Corporation (Moria), for the Riggins property. Sunny Ridge, the Wilhites, and Moria entered into an escrow agreement (second escrow). The Pension Fund was not a party to the second escrow. According to the second escrow, Moria agreed to pay off the Overlander contract, execute a promissory note in favor of the Wilhites for $50,000, and assume the pay-

ments on a second promissory note (September note) executed by the Wilhites in favor of the Pension Fund. The September note was to be due January 15, 1994 (ten years after the January note was due), and was executed in the amount of $231,342.14. The protection warranty deed from the first escrow was placed in the second escrow, but the earlier January note remained in the then closed first escrow.

In 1983, Walter Wilhite created the Trust. He appointed himself and his son, Larry Wilhite, as co-trustees of the Trust. A year later, the Wilhites assigned their interests in the Riggins property to the Trust. This assignment was recorded.

In the meantime, Moria experienced financial difficulties. When Moria failed to keep the Overlander contract current, Walter Wilhite borrowed $45,000 from U.S. National Bank of Oregon to pay off the Overlander contract. He then asked the Pension Fund to assume the payments on the note to U.S. National Bank of Oregon. The Pension Fund agreed and eventually paid the balance of the note ($51,753.52).

Moria defaulted on July 23, 1985. In 1986, Walter Wilhite requested the Pension Fund to make a $5,000 payment to Moria to facilitate a settlement agreement whereby Moria would deed the Riggins property to the Wilhites. The Pension Fund agreed and paid Moria $5,000. Title to the Riggins property was quieted and returned to the Wilhites. As a result, the escrow holder returned the 1982 protection warranty deed which had been placed in the first escrow and the September note to the Wilhites' Idaho attorney.

In May of 1986, Walter Wilhite was diagnosed with a brain tumor and surgery was set to determine the nature and extent of the tumor. Walter Wilhite met then with the Pension Fund's secretary-treasurer, Beatrice Goldsmith, to discuss revisions to a "land for debt" contract. The original draft of the contract was prepared by David Whitney, who at the time appears to have been representing both the Pension Fund and the Wilhites. In it, title to the Riggins property

would be transferred to the Pension Fund in exchange for a cancellation of any debt Walter Wilhite owed to the Pension Fund.

On June 11, 1986, Walter Wilhite underwent surgery to remove the tumor. The surgery confirmed both the cancer diagnosis and that Walter Wilhite was terminally ill. He was subsequently transferred to Friendsview Manor retirement home.

Mrs. Goldsmith prepared the "land for debt" contract from Mr. Whitney's drafts, made the changes Walter Wilhite requested, and delivered them to him at Friendsview Manor on December 5, 1986. On that same date, Walter Wilhite, as trustee for the Trust, signed the contract and a warranty deed conveying the Riggins property to the Pension Fund. Three days later, the Pension Fund recorded the warranty deed. However, neither the contract nor the warranty deed directed the other trustee, Larry Wilhite, to remove the Riggins property from the Trust as required by Article II of the Trust. In addition, no writing evidencing Walter Wilhite's intention to revoke or amend the Trust was delivered to Larry Wilhite during Walter Wilhite's lifetime pursuant to Article VI of the Trust. On December 24, 1986, Walter Wilhite died.

Sometime later, the Pension Fund determined that a logging agreement for the Riggins property entered into by Larry Wilhite, acting as trustee, with Gene Swift, (Swift Contract) was economically disadvantageous. As a result, the Pension Fund negotiated a cancellation of the Swift Contract for $35,000. Subsequently, Larry Wilhite entered into another logging contract and sold the timber at a price higher than that in the Swift Contract.

Larry Wilhite, as surviving trustee of the Trust, filed suit seeking rescission of the December 1986 deed executed by Walter Wilhite. The Pension Fund counterclaimed and filed a third-party complaint against the estate of Walter Wilhite to recover on the 1982 promissory note and protection warranty deed executed by Walter Wilhite.

The district court granted partial summary judgment in favor of the Trust ruling (1) that the December 1986 deed and accompanying documents were invalid under the Trust agreement for lack of the signature of the co-trustee Larry Wilhite; (2) Walter Wilhite never revoked the subject Trust during his lifetime; and (3) the 1982 promissory notes and protection warranty deed were ineffective because of a failure of consideration and nondelivery of those documents. The district court also granted partial summary judgment in favor of the Trust regarding the Pension Fund's claims for reimbursement for monies it spent relative to the Riggins property.

At the jury trial on the issue of damages, the district court denied the Trust's request to submit questions of trespass and resulting punitive damages to the jury. The jury returned a verdict of $7,050 in favor of the Trust and trustee Larry Wilhite. Thereupon, the district court entered judgment for damages plus interest and costs totaling $13,-817. The Pension Fund appealed from the partial summary judgments and the final judgment, and the Trust cross-appealed on the issues of trespass and punitive damages.

## II.

### ISSUES ON APPEAL

1. Can the settlor of a revocable inter vivos trust, who is also a co-trustee, withdraw real property from the trust or partially revoke the trust as to such real property by executing a deed conveying the property, or are the signatures of all co-trustees necessary for this purpose?

2. Does conveyance of real property constitute consideration for the promise of the grantee to pay a debt owed by the grantor? Does forbearance on the part of the creditor of the grantor constitute consideration?

3. Under the facts of this case, was there valid delivery of one or more promissory notes and a protection warranty deed which were placed in escrow?

4. If a conveyance of real estate made in consideration for forgiveness of debt is re-

scinded, is the creditor entitled to restoration of the debt and any security therefor?

5. Where the owner of real property pursuant to a deed which is later rescinded expends funds to pay taxes, liens and prior contracts and to preserve the property, is such owner entitled to restitution of such expenses upon rescission? If so, is interest on such expenses also recoverable?

The Trust raises the following issue on cross appeal:

1. Whether the trial court erred in refusing to instruct the jury as to the issues of trespass and resulting punitive damages.

## III.

## STANDARD OF REVIEW

■ The Pension Fund appeals the entry of summary judgment against it by the district court. In such a case, we employ the same standard as that used by the district court when ruling on the motion. The record is liberally construed in the light most favorable to the party opposing the motion, and all reasonable inferences and conclusions are drawn in that party's favor. *Friel v. Boise City Housing Authority,* 126 Idaho 484, 485, 887 P.2d 29, 30 (1994).

## IV.

## ANALYSIS

**A. The Failure to Join the Co–Trustee to the Land for Debt Transaction Voided the 1986 Deed.**

■ Initially, we must address the Pension Fund's contention that Walter Wilhite acted as "settlor" and partially revoked the Trust or withdrew trust property when he signed the "land for debt" contract and the warranty deed on December 5, 1986. The "land for debt" contract unambiguously states "[t]his agreement is made and entered into ... by and between Walter E. Wilhite Revocable Living Trust ... and Northwest Yearly Meeting Pension Fund." Nowhere in the agreement does Walter Wilhite, in his capacity as "settlor," covenant to partially revoke the Trust or order himself, in his role as trustee, to withdraw trust property. Furthermore, Walter Wilhite signed the agreement, "Walter E. Wilhite Revocable Living Trust, Walter E. Wilhite, Trustee."

■ The contract unambiguously makes clear that the agreement was between the Pension Fund and Walter Wilhite, *trustee* for the Trust. It is the rule in Idaho that oral and written statements are inadmissible to contradict or vary unambiguous terms. *Hall v. Hall,* 116 Idaho 483, 484, 777 P.2d 255, 256 (1989); *Gardner v. Fliegel,* 92 Idaho 767, 770–71, 450 P.2d 990, 993–94 (1969). The contract and the warranty deed were signed "Walter E. Wilhite, Trustee." Walter Wilhite's signature makes clear that the purported transfer of the Riggins property was done in his capacity as trustee of the Trust. In the face of such an unambiguous statement, we refuse to find that Walter Wilhite in signing the contract and warranty deed was acting in any capacity other than that of trustee.

■ Moreover, it is clear that if Walter Wilhite was attempting to act in his role as settlor and partially revoke the Trust as to the Riggins property, he failed to follow the revocation procedures detailed in the Trust agreement. When a settlor provides for the mechanism by which the power of revocation is to be exercised, these procedures must be followed for there to be a valid revocation. *See generally,* George C. Bogert & George T. Bogert, Law of Trusts § 148, at 535 (5th ed. 1973); RESTATEMENT (SECOND) OF TRUSTS § 330 cmt. j at 139 (1959). In Article VI of the Trust document, Walter Wilhite specifically reserved himself, as settlor, the right to amend or revoke the Trust "by a writing (other than a will) signed by me and delivered to my TRUSTEES during my lifetime, but the duties or compensation of my TRUSTEES shall not be changed without the consent of my TRUSTEES." This revocation procedure was not complied with as no such writing was ever delivered to

Larry Wilhite during Walter Wilhite's lifetime. Thus, assuming *arguendo* that Walter Wilhite was acting as "settlor" of the Trust and attempted to partially revoke the Trust when he signed the contract and warranty deed, the transfer is invalid as it did not comply with the revocation procedures of Article VI.

■ Having determined that Walter Wilhite signed the "land for debt" contract and the warranty deed as "trustee," the next question we confront is whether a co-trustee can sell or exchange trust property individually. The district court found that Walter Wilhite had no power, as co-trustee, to sell or transfer property from the Trust without the consent of the co-trustee. We agree.

The Trust document contains several provisions which imply that the co-trustees must join in an act such as this. Article VII of the Trust document details the powers of the trustees, collectively referred to as the fiduciary.[1] One provision of Article VII states "[t]he fiduciary is authorized and empowered ... to sell or exchange any property contained in the estate." The Trust document also contains a provision for successor trustees which implies that the trustees hold title to the Trust as joint tenants, a provision consistent with the rule that co-trustees must act in unison.

Other jurisdictions have recognized the principle that co-trustees must not act independently of one another. *See, e.g., Colburn v. Grant,* 181 U.S. 601, 606, 21 S.Ct. 737, 739, 45 L.Ed. 1021 (1901) (recognizing the principle that "cotrustees may not act independently of one another, nor ignore each other in the management of the trust"); *Union Bank & Trust Co. of Helena v. Penwell,* 99 Mont. 255, 42 P.2d 457, 462 (1935) (stating "it is clear that both under our statutes and the general rule under the common law the act of one only of the trustees is not sufficient");

*Cooper v. Federal Nat. Bank of Shawnee,* 175 Okla. 610, 53 P.2d 678, 682 (1936) (holding that "cotrustees cannot act independent of one another, and the disagreement between the trustees in this case renders the act of each a nullity"). The principle that two trustees must exercise trust powers unanimously can also be inferred from I.C. § 68–109(a) which provides that "any power vested in 3 or more trustees may be exercised by a majority...."

The Trust agreement required both Larry and Walter Wilhite, as co-trustees, to join in the sale or exchange of trust property. In light of this, and the fact that Walter Wilhite signed the documents as trustee, but his co-trustee Larry Wilhite did not execute the "land for debt" contract or the warranty deed, there exists no factual dispute precluding a grant of summary judgment. We therefore affirm the district court's judgment of rescission of the "land for debt" contract and accompanying warranty deed.

## B. Valid Consideration Supported the 1982 Promissory Note and Protection Warranty Deed.

■ The Trust contends the first escrow agreement was only a "stand-in" agreement used to facilitate the transfer of the Riggins property and its obligations from Sunny Ridge to Moria. Therefore, when Moria defaulted and the second escrow failed, there was a complete failure of consideration for the January 1982 note. However, the Pension Fund denies that the first escrow agreement was merely "a stand-in" document. It argues that the January transaction was supported by consideration since the Wilhites received the Riggins property in exchange for an outright assumption of Sunny Ridge's debt. At the very least, the Pension Fund notes, the transaction represents a forbearance of its legal rights against Sunny Ridge in order to facilitate the establishment of the

---

1. *ARTICLE VII. ADMINISTRATIVE POWERS OF MY TRUSTEES.*

A. In addition to and not in limitation of all power, authority and discretion granted to my TRUSTEES (collectively referred to in this Arti-cle as the "fiduciary") under applicable law, but subject to any contrary provision of this instrument, the fiduciary is authorized and empowered ... [listing enumerated powers].

first escrow agreement. The district court concluded that the transaction was unsupported by consideration. We disagree.

Regardless of whose characterization of the transaction's ultimate purpose is correct, be it a stand-in agreement or an outright assumption, the Pension Fund's decision to forbear from enforcing its legal rights against Sunny Ridge constituted consideration for the January 1982 note. This Court has previously recognized that the forbearance to exercise a right against either a promisor or a third person is sufficient consideration for a contract. *McMahon v. Auger*, 83 Idaho 27, 38, 357 P.2d 374, 380 (1960); *see also, Quayle v. Mackert*, 92 Idaho 563, 569, 447 P.2d 679, 685 (1968).

In this case, neither party disputes that the Pension Fund had a valid, enforceable debt against Sunny Ridge secured by the Riggins property. As a result, the Pension Fund could have insisted on payment of the note or foreclosed on the Riggins property pursuant to the Sunny Ridge protection warranty deed. The Pension Fund's forbearance to exercise these rights in order to facilitate the 1982 transaction constituted consideration for the first escrow agreement. Accordingly, we vacate the district court's grant of summary judgment to the Trust on this issue.

### C. A Question of Fact Exists as to Whether Walter Wilhite Delivered the Documents into the First Escrow Subject to a Condition.

As noted above, the Pension Fund views the first escrow as a transfer of the Riggins property for the Wilhites' assumption of Sunny Ridge's debt and therefore argues that delivery occurred upon the deposit of the documents into the first escrow. Upon Moria's default, the Pension Fund asserts that the parties returned to their status under the first escrow agreement. The Trust denies that after Moria's default the parties returned to the legal relationship under the first escrow agreement. It contends the January 1982 note and deed were condi-

tionally delivered into the escrow. The Trust asserts that since the first escrow agreement provided that the documents should be delivered to the Pension Fund only upon a default by the Wilhites, the Wilhite's default was a condition precedent to delivery. Because the Wilhites never defaulted, the Trust argues the condition precedent to delivery never occurred. Thus, according to the terms of the second escrow, which it asserts replaced and closed the first escrow, Moria's subsequent default caused the return of the warranty deed, undelivered, to the Wilhites. The district court agreed and concluded that the January 1982 documents failed for nondelivery. We hold that a genuine issue of material fact exists and remand for further findings of fact regarding Walter Wilhite's intent when he placed the documents into the first escrow.

It is the rule in Idaho that before a deed can operate as a valid transfer of title, there must be a delivery of the instrument during the lifetime of the grantor. *Crenshaw v. Crenshaw*, 68 Idaho 470, 475, 199 P.2d 264, 266 (1948). The essential and controlling element in determining whether a delivery has occurred is the intention of the grantor. *Williams v. Williams*, 82 Idaho 451, 455, 354 P.2d 747, 749 (1960). In addition, where notes are given subject to conditions upon their delivery, observance of those conditions is essential to the validity of the notes and such conditions are not an oral contradiction of the written agreement. *Ventures, Inc. v. Jones*, 101 Idaho 837, 841, 623 P.2d 145, 149 (1981).

In support of its contention that no such condition existed, the Pension Fund asserts that Walter Wilhite acknowledged the debt to be his, urged the creation of the "land for debt" agreement to settle his accounts and even demanded certain changes be made to the agreement. On the other hand, the Trust notes that the first escrow states that the documents are only to be delivered to the Pension Fund if the Wilhites default and in fact, upon Moria's default, the documents were not delivered to the Pension Fund, but returned to the Wilhites.

Liberally construing the record in the light most favorable the Pension Fund, and drawing all reasonable inferences and conclusions in its favor, we find that a genuine issue of material fact exists as to Walter Wilhite's intent when he placed the documents into the first escrow. As a result, the district court's grant of summary judgment in favor of the Trust was improper.

■ Further, for guidance to the district court on remand, we explicitly reject the Trust's argument that the second escrow was a substitute for and a replacement of the prior first escrow agreement. The Trust contends the second escrow agreement represented the knowing relinquishment by the Pension Fund of its security interest in the Riggins property. In support of this proposition, the Trust notes that a contract may be set aside by a subsequently executed contract which either deals with the subject matter of the prior contract so comprehensively as to raise the inference of substitution or is so inconsistent with the prior contract that the two cannot stand together, *citing Silver Syndicate, Inc. v. Sunshine Mining Co.*, 101 Idaho 226, 235, 611 P.2d 1011, 1020 (1979).

■ This rule of law is inapplicable because the Pension Fund was not a party to the second escrow agreement. The contractual rights of the Pension Fund could not be taken away by a contract between Moria and the Wilhites no matter how comprehensively the contract between them may have dealt with the subject matter of the earlier contract. The Pension Fund's consent to Moria's purchase of the Riggins property and assumption of payments did not amount to a consent to a relinquishment of the Pension Fund's security interest in the Riggins property. We therefore explicitly reject the Trust's arguments based on *Silver Syndicate, supra.*

### D. The District Court Should Readdress the Pension Fund's Demand for a Restoration of the Security and Debt Evidenced by the January 1982 Promissory Note and Warranty Deed.

The Pension Fund asked the district court to reinstate the debt and security evidenced by the January 1982 note and protection warranty deed should it void the "land for debt" agreement. However, the district court refused to reinstate the debt because it held that the documents which evidenced the debt were void for failure of consideration and nondelivery. Because we remand for further proceedings on the delivery issue, we instruct the district court to readdress this issue upon its ultimate determination regarding delivery.

### E. The Pension Fund is Entitled to Recover Amounts it Expended on the Riggins Property which Benefited the Trust.

■ Should the Trust gain title to the Riggins property and the debt evidenced by the 1982 note and deed not be reinstated, the Pension Fund urges us to instruct the district court to employ the equitable doctrine of unjust enrichment. The Pension Fund asserts the payment of certain amounts, namely the Overlander pay-off, the Moria settlement, and the Swift cancellation, benefited the Trust by clearing title to the Riggins property. As such, failure to reimburse the Pension Fund would unjustly enrich the Trust. The district court denied any recovery to the Pension Fund of these amounts.

■ This Court has held that knowledge of another's interest in property negates the good faith necessary to recover in restitution for improvements to property. *Fouser v. Paige*, 101 Idaho 294, 298, 612 P.2d 137, 141 (1980). However, the Court in *Fouser* explicitly refused to consider the claim of unjust enrichment. *Id.* at 298–99, 612 P.2d at 141–42. As that opinion indicates, unjust enrichment is a distinct equitable remedy. The essence of a claim of unjust enrichment lies in proof that the defendant received a benefit which it would be inequitable to retain. Therefore, the measure of recovery is the amount of enrichment as between the two parties which it would be unjust for one party to retain. *Beco Constr. Co. v. Bannock Paving Co., Inc.*, 118 Idaho 463, 466, 797 P.2d 863, 866 (1990); *Continen-*

*tal Forest Prod., Inc. v. Chandler Supply Co.,* 95 Idaho 739, 743, 518 P.2d 1201, 1205 (1974).

The Pension Fund's payment of the Overlander Contract removed the first priority lien which encumbered the property. In addition, its payment of $5,000 to Moria facilitated the return of the Riggins property to the Wilhites. In both instances, the Pension Fund's actions benefited the Wilhites, thereby enriching the Trust should it be determined to be the ultimate title holder to the Riggins property. In such a case, retention of these amounts by the Trust would be unjust and therefore should be recoverable by the Pension Fund.

■ The same cannot be said of the Pension Fund's payment in cancellation of the Swift contract. It would be unjust to require the Trust to reimburse the Pension Fund for its interference with the Swift contract. Further, any benefits which inured to the Trust from the Pension Fund's interference were the results of the Trust's own efforts. On remand, should the judgment result in no reinstatement of the debt evidenced by the first escrow agreement, we direct the district court to apply the theory of unjust enrichment in accordance with this opinion.

**F. The District Court Properly Rejected the Trust's Demand For Jury Instructions on Trespass and Punitive Damages.**

■ The Trust argues on its cross-appeal that the district court erred in its refusal to instruct the jury on issues of trespass and punitive damages. Given the state of the record as submitted on this appeal, we disagree.

■ Trespass is a tort against possession committed when one, without permission, interferes with another's exclusive right to possession of the property. *See, Jaquith v. Stanger,* 79 Idaho 49, 54, 310 P.2d 805, 808 (1957). However, one who holds property under a colorable claim of ownership is not subject to an action of trespass by the true owner. *See generally,* W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 13 at 77 (5th ed. 1984). Since the Pension Fund acted in accordance with rights it would have possessed if the 1986 deed were valid, the Pension Fund cannot be liable in an action for trespass. Accordingly, we find no error in the district court's refusal to instruct the jury on the issue of trespass.

■ Nor do we believe the district court erred in its refusal to instruct the jury as to punitive damages. Whether or not to submit the question of punitive damages to the jury rests within the sound discretion of the trial court. *Curtis v. Firth,* 123 Idaho 598, 604, 850 P.2d 749, 755 (1993). Furthermore, punitive damages are not favored by the law and should be awarded cautiously and only in the most unusual and compelling circumstances. *Manning v. Twin Falls Clinic & Hosp.,* 122 Idaho 47, 52, 830 P.2d 1185, 1190 (1992); *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 904–05, 665 P.2d 661, 668–69 (1983). In particular, punitive damages are appropriate in a trespass action when the defendant acted in a manner which was outrageous, unfounded, unreasonable, and in conscious disregard of the plaintiff's property rights. *See, e.g., Skelton v. Haney,* 116 Idaho 511, 512, 777 P.2d 733, 734 (1989); *Aztec Ltd., Inc. v. Creekside Inv. Co.,* 100 Idaho 566, 570, 602 P.2d 64, 68 (1979).

We note again that the Pension Fund proceeded in accordance with the rights it believed it possessed as a result of the 1986 deed. As a result, we are not persuaded that it acted in a manner that was an extreme deviation from reasonable standards of conduct. Thus, we conclude that the district court did not abuse its discretion in its refusal to instruct the jury as to punitive damages.

**V.**

**ATTORNEY'S FEES**

Since this is an action to recover on a promissory note, both parties to the appeal

make a demand for attorney's fees pursuant to I.C. § 12–120. We award the Pension Fund attorney's fees on appeal as well as on cross-appeal.

## VI.

### CONCLUSION

We affirm the district court's determination that the Pension Fund's failure to obtain the signature of co-trustee Larry Wilhite voided the "land for debt" contract and warranty deed. However, we vacate the district court's determination that the January 1982 note was unsupported by consideration and remand for further proceedings regarding Walter Wilhite's intent.

In light of this disposition, we direct the district court on remand to readdress the Pension Fund's demand for a restoration of security. Should the district court proceedings result in no restoration of the debt and security evidenced by the 1982 note and deed, we direct the district court to order the Trust to reimburse the Pension Fund for certain amounts under the doctrine of unjust enrichment.

Finally, given the state of the record on appeal, we affirm the district court's refusal to instruct the jury as to issues of trespass and punitive damages.

Costs and attorney's fees on appeal and cross-appeal to the Pension Fund.

McDEVITT, C.J., TROUT and SCHROEDER, JJ., and SCHILLING, Justice Pro Tem., concur.